UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

LAURIE KELLOGG,                                    CIVIL ACTION
                                                   CASE #
                        Plaintiff,                 **COMPLAINT**

            -against-

                                                   **07 CIV. 2804**

NEW YORK STATE DEPARTMENT OF CORRECTIONAL          **JUDGE JONES**
SERVICES (DOCS); GLENN S. GOURD, Commissioner of DOCS;
LUCIEN LeCLAIRE, Deputy Commissioner for Facility Operations,
FRANK HEADLY, DOCS Deputy Commissioner of Programs
STEVE BERNARDI, DOCS Deputy Commissioner of Policy and Compliance Review
DONNA M. MASTERSON, DOCS Americans with Disabilities Act Coordinator;
LESTER WRIGHT, DOCS Deputy Commissioner and Chief Medical Officer;
ELAINE LORD, former Supt. BEDFORD HLLS CORRECTIONAL FACILITY (BHCF);
ADA PEREZ Superintendent BHCF
TERRENCE MCELROY, BHCF former Deputy of Security;
GWEN.E. SCHNEIDER, BHCF Deputy of Security;
LORI GOLDSTEIN, BHCF Medical Director,
LT. ROBERT BALL BHCF Corrections Officer;
LT. BRANDON SMITH, BHCF Corrections Officer
SGT. CHRISTOPHER MURRAY, BHCF Corrections Officer;
SGT. MARK ARMSTRONG, BHCF Corrections Officer;
SGT. GARY NOTARO, BHCF Corrections Officer;;
C.O. MICHAEL BARCLAY, BHCF Corrections Officer;
C.O. BARRON ROGER BHCF Corrections Officer;
C.O. TRACY DUNCAN, BHCF Corrections Officer;
C.O. BINITA WILLIAMS  BHCF Corrections Officer;
C.O. ALLEN ROBINSON BHCF Corrections Officer;
C.O. ROSLIE JACKSON, BHCF Corrections Officer;
                        Defendants

INTRODUCTION

This action against the above defendants seeks compensatory and punitive damages for

injuries suffered by Plaintiff LAURIE KELLOGG, by reason of gross, malicious and deliberate

misconduct and malfeasance by the above named defendants, certain of whom acted in concert

and under color of the laws of the State of New York.  Plaintiffs' rights, as guaranteed by the

1

First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, 42

U.S.C. §1983 and Under Article 1, § 5, 6, 8 and 11of the New York State Constitution and under

statutory and common law of New York State were violated. Plaintiff also seeks damages under

Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act to

redress the failure of certain of the above named defendants to provide adequate and proper

treatment for her injuries and disabilities, and proper access to prison programs, services and

activities for prisoners with disabilities in the custody of the Department of Correctional Services

and housed in its Regional Medical Unit. Plaintiff seeks equitable and injunctive relief

prohibiting the continuation of the misconduct alleged in the complaint.

## JURISDICTION

1.  Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. §§ 1331 and 1343

    (3) and (4) in conjunction with the Civil Rights Act of 1871, 42 U.S.C. § 1983, 1985 and

    1986 and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S.

    Constitution.

2.  Plaintiff has duly exhausted administrative remedies, as required by the Prisoner

    Litigation Reform Act, 42 U.S.C. §1997(e)(2), filing written complaints and grievances

    with defendants, officials and administrators of both New York State Department of

    Correctional Services ("DOCS") and Bedford Hills Correctional Facility ("BHCF")

3.  Plaintiff requests the court exercise its powers to invoke pendant claims and pendant

    jurisdiction under 28 U.S.C. § 1367 as the State law claims have a common nucleus of

    operative facts with the federally based claims and arise out of the same transactions and

    occurrences giving rise to the plaintiff' federally based claims and causes of action.

2

4.   The value of the rights in question exceeds $100,000.00, exclusive of interest and costs.

## PARTIES

### PLAINTIFF

5.   Plaintiff LAURIE KELLOGG, (hereinafter "KELLOGG"), is a citizen of the United
States and was, at all material times, of full age and an inmate in the care and custody of
the Defendant Department of Correctional Services (DOCS) of the State of New York at
the women' correctional facility at Bedford Hills, New York (BHCF) and remains in
their care and custody.

6.   Plaintiff has multiple disabilities that substantially limit one or more of her major life
activities.  She is hearing impaired, asthmatic and suffers from TMJ, migraine headaches
and stomach ailments.  She has an irregular heartbeat and a severe arthritis shoulder
condition (the result of a torn rotator cuff injury for which she has already had one failed
surgery and will likely need another) and an elbow injury for which she was caused to
suffer nerve damage and has had multiple surgeries).  She has been medically prohibited
by DOCS medical staff from engaging in such physical activities as "pushing, pulling or
lifting" and similar activities.

7.   KELLOGG is an "individual with disabilities" as that term is defined in Section 504 of
the Rehabilitation Act, 29 U.S.C. §794 and the Americans with Disabilities Act, 42
U.S.C. §12102.

### THE DEFENDANTS

8.   Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONALSERVICES
(Hereinafter DOCS) is a New York State agency created to operate prison facilities

3

within the State, including Bedford Hills Correctional Facility, (hereinafter BHCF) a women's facility.

9.  Defendant GLENN S. GOURD, (Hereinafter GOURD) was and is commissioner of DOCS and is sued in his official capacity. As DOCS commissioner, GOURD was and is responsible for the operation and administration of all DOCS facilities, including BHCF and all inmates confined therein, and of all matters relating to government, discipline, policing, contracts and fiscal concerns, along with the duty to inquire into all matters connected with its correctional facilities, and has authority to make such rules and regulations for the government of DOCS officers and other employees assigned to its facilities in regard to duties to be performed by them.

10. Defendant FRANK HEADLY, (hereinafter HEADLY) upon information and belief, was and is DOCS Deputy Commissioner of Programs and is sued in his official capacity. As Deputy Commissioner, HEADLY is responsible for administration of DOCS programs, including vocational, work and educational programs.

11. Defendant LUCIEN LeCLAIRE, (hereinafter LeCLAIRE), upon information and belief, was and is DOCS Deputy Commissioner for Facility Operations and is sued in his official. As Deputy Commissioner, LeCLAIRE is responsible for ensuring that DOCS policies at its institutions, comply with the law.

12. Defendant STEVE BERNARDI, (hereinafter BERNARDI), upon information and belief, was and is DOCS Deputy Commissioner of Policy and Compliance Review and is sued in his official capacity. As Deputy Commissioner, BERNARDI is responsible for ensuring that DOCS policies and institutions comply with Section 504 of the

4

Rehabilitation Act and the Americans with Disabilities Act.

13. Defendant DONNA MASTERSON, (hereinafter MASTERSON), upon information and
belief, was and is DOCS Americans with Disabilities Act Coordinator and is sued in her
official capacity. As Coordinator, she is responsible for ensuring that all programs,
activities and services operated by and under the control of DOCS comply with Section
504 of the Rehabilitation Act and the Americans with Disabilities Act.

14. Defendant LESTER WRIGHT, (hereinafter WRIGHT), upon information and belief,
was and is DOCS Deputy Commissioner and Chief Medical Officer; and is sued in his
official capacity. WRIGHT is responsible for ensuring that DOCS medical staffs
conduct individual assessments of a prisoner's disabilities, including their ability to
perform tasks required by program participation.

15. ELAINE LORD, (hereinafter LORD) was, during a material period of time relating to
plaintiffs' claims, BHCF Superintendent. She is black and is sued individually and in
her official capacity. She was responsible for the operation, supervision and
management of BHCF.

16. ADA PEREZ, (hereinafter PEREZ) was, during a material period of time relating to
plaintiffs' claims, BHCF Superintendent. She is being sued personally and in her official
capacity. She was and is responsible for the operation, supervision and management of
the Bedford facility.

17. TERRENCE MCELROY, (hereinafter MCELROY) was, during a material period of
time relating to plaintiff's claims, Deputy of Security at BHCF and, from on or about
March 1, 2004 until his retirement, acting Superintendent of BHCF. He is black and is

being sued individually and in his official capacity. As Deputy of Security, McELROY was authorized to enforce rules and regulations disciplining, policing and governing inmates housed in BHCF. As acting Superintendent, he was responsible for the operation, supervision and management of BHCF.

18. GWEN. E. SCHNEIDER, (hereinafter SCHNEIDER), was, during a material period of time relating to plaintiff's claims, the Deputy of Security of the BHCF. She is sued individually and in her official capacity. As Deputy of Security, she was authorized to enforce rules and regulations disciplining, policing and governing inmates at BHCF.

19. LORI GOLDSTEIN, (hereinafter GOLDSTEIN) was, during the relevant time relating to plaintiffs claims, the Medical Director of the BHCF. She is sued both individually and in her official capacity.

20. LT. ROBERT BALL (hereinafter BALL) was, during a material period of time relating to plaintiff's claims, an officer at the BHCF. He is being sued both individually and in his official capacity.

21. LT. BRANDON. SMITH, (hereinafter SMITH) was, during a material period of time relating to plaintiff's claims, an officer at the BHCF and is being sued both individually and in their official capacity.

22. SGT. CHRISTOPHER MURRAY (hereinafter MURRAY) was, during a material period of time relating to plaintiff's claim, an officer at the BHCF. He is being sued both individually and in his official capacity.

23. SGT. MARK ARMSTRONG (hereinafter ARMSTRONG) was, during a material period of time relating to plaintiff's claim, an officer at the BHCF. He is being sued both

individually and in his official capacity.

24. SGT. GARY NOTARO, (hereinafter NOTARO) was, during a material period of time
    relating to plaintiff's claim, an officer at the BHCF. He is being sued both individually
    and in his official capacity.

25. C.O. MICHAEL BARCLAY, (hereinafter BARCLAY) was, during a material period of
    time relating to plaintiff's claim, an officer at the BHCF. He is being sued both
    individually and in his official capacity.

26. C.O. BARRON ROGERS (hereinafter ROGERS) was, during a material period of time
    relating to plaintiff's claim, an officer at the BHCF. He is being sued both individually
    and in his official capacity.

27. C.O. TRACY DUNCAN (hereinafter DUNCAN) was, during a material period of time
    relating to plaintiff's claim, an officer at the BHCF. She is black and being sued both
    individually and in her official capacity.

28. C.O. BONITA WILLIAMS (hereinafter WILLIAMS) was, during a material period of
    time relating to plaintiff's claim, an officer at the BHCF. She is being sued both
    individually and in her official capacity.

29. C.O. ALLEN ROBINSON (hereinafter ROBINSON) was, during a material period of
    time relating to plaintiff's claim, an officer at the BHCF. He is being sued both
    individually and in his official capacity.

30. C.O. ROSLIE JACKSON (hereinafter JACKSON) was, during a material period of time
    relating to plaintiff's claim, an officer at the BHCF. She is being sued both individually
    and in her official capacity.

PRELIMINARY FACTS

31. Plaintiff's claims are for wrongful retaliation. The retaliation taken against plaintiff was for her efforts to exercise and enforce rights under law. The wrongful retaliation resulted in plaintiff being denied rights and privileges afforded other inmates, in plaintiff having to endure arbitrary and capricious placements and status designation, in plaintiff's legal rights being outright denied or maliciously interfered with by government officials, in plaintiff being deliberately caused to suffer physical isolation, physical and sexual harassment, brutality and torture. The wrongful retaliation resulted in plaintiff having false and malicious internal charges filed against her, harassing cell searches, wrongful and extensive confinement in SHU and overt abuse and violation of established due process procedures to the point where due process of her grievances was a farce. The brutality and torture included deliberate and punitive misuse BHCF's control over plaintiff's medical items which control was used to wantonly and without medical reason deprive plaintiff of necessary and material pain medication, pain equipment and other previously authorized medical items prescribed to address plaintiff's substantial medical needs.

32. "SHU" stands for "special housing unit". BHCF officials, with knowledge and approval from DOCS' officials, use "SHU" to punish inmates accused of and/or administratively found to have broken facility rules. SHU inmates are intentionally isolated from the general population and denied privileges and certain creature comforts afforded inmates in the general population. Inmates confined to SHU are required to have their confinement reviewed every 30 days.

8

33. Plaintiff's grievances, except in rare cases, have accomplished little to address the violations of her rights by virtue of the wrongful retaliation, particularly those grievances alleging abuse or harassment. Numerous obstacles were placed in plaintiff's path in filing grievances and in seeking recourse. Plaintiff was threatened with retaliation and/or her filed grievances were lost or misplaced. Investigations undertaken pursuant to her grievances were minimal, if at all. Hearing held on tickets issued to plaintiff resulted in her being denied basic due process, by refusal to allow witnesses to appear on her behalf and/or having "secret" evidence introduced against her for which she was denied access to or information about. Her appellate rights on charges were also violated when plaintiff's appeal was denied without proper documentation or evidence being forwarded to the appellate agency.

34. Written and oral complaints to DOC officials of such use have been ignored by GOURD, LECLAIRE, WRIGHT, LORD, PEREZ, MCELROY and SCHNEIDER. In fact, some of these very officials have used SHU for such purposes, as will be explained below.

FACTS ON THE CASE

35. Plaintiff LAURIE KELLOGG, was born 8/16/64, is white, Christian, physically disabled and is currently an inmate in the care, control and custody of defendant DOCS at BHCF. KELLOGG arrived at the BHCF on September 18, 1992.

36. Plaintiff's claims of wrongful retaliation include wrongful retaliation for refusing to engage in illegal sexual activities with BHCF officials or friends of such officials; for reporting sexual abuse against BHCF officials and for the exercise of legal rights protected under the federal and state constitutions. The wrongful retaliation against her

9

has been long-term.

37. In early 1993, a female peer counselor approached plaintiff and proclaimed her "love" and desire to enter a "relationship" with her akin to marriage. Plaintiff, a heterosexual Christian, declined. Shortly thereafter, a BHCF staff counselor approached plaintiff and informed her that she, the counselor, had substantial influence with defendant LORD. She further told plaintiff she could do her time "the easy way" by becoming part of their "inner circle" by agreeing to a lesbian relationship with the infatuated lesbian peer counselor. Plaintiff again declined. Plaintiff later learned that the BHCF staff counselor was LORD'S "significant other". KELLOGG'S refusal to join the "inner circle" marked her as target for retaliation by LORD and her "inner circle" at BHCF.

38. Over the next few years, KELLOGG was subjected to numerous retaliatory incidents relating to her refusal to join the "inner circle". These included being falsely named in a number of internal investigations conducted by New York State's Investigator General's Office (hereinafter NYSIG), being removed from her cell and isolated without cause or reason to areas deemed off limits under DOC policies and random cell searches.

39. When KELLOGG complained to DOCS about her mistreatment, defendant LORD retaliated by designating Plaintiff a "tracker". This was done in the fall of 1996, four (4) years after Plaintiff entered BHCF and continues to the present day.

40. "Tracker" designation is a designation not found in DOCS written rules or regulations. It does not exist in any male DOCS facility in New York. Upon information and belief, it exists solely at BHCF. Despite its uniqueness to BHCF, there are no BHCF directives, standard operating procedures (SOPS), memos or internal regulations defining what a

"tracker" is, how or why an inmate is designated a tracker or how an inmate sheds this designation. It is applied to a very limited number of inmates at BHCF. Upon information and belief, up until her retirement, the designation was applied at the sole discretion of LORD.

41. Plaintiff KELLOGG'S tracker designation served no legitimate penological purpose. As mentioned above, plaintiff had been at BHCF four years before being designated and was considered a model prisoner (until the relatively recent spate of retaliatory, harassing tickets issued her).

42. Plaintiff's "Tracker" status is plainly discriminatory and punitive. It has wrongfully drawn significant unwanted and unwarranted attention towards Plaintiff from other inmates and BHCF staff. It has made Plaintiff and other tracker designated inmates more susceptible to verbal, physical and sexual abuse and harassment within BHCF from guards and other inmates. The absence of written protocols for "trackers" has subjected plaintiff and similarly situated inmates to arbitrary, capricious and punitive rules that can and have changed without notice and literally with the changing of the guards.

43. Tracker status has deprived and/or curtailed plaintiff of rights and privileges afforded other inmates without due process or grievance rights available since tracker status is not an authorized or recognized status under DOCS rules or state law.

44. Since April of 1997 and continuing to the present, plaintiff's "tracker" status has negatively impacted on a variety of plaintiff's rights within BHCF. As a tracker, her trailer visits are limited to once every six months. Non-trackers are allowed such visits every six weeks. Her status requires her to be housed in a trailer closest to the C.O.

11

station, affording less privacy during visits. Her status requires her to submit requests

for trailer visits 3 weeks prior to a visit for superintendent pre-approval.

45. KELLOGG'S arbitrary and capricious "tracker" status has caused and continues to cause

unwarranted notoriety and stigma within BHCF. It is a continuing source of ridicule and

embarrassment within BHCF. Her status has been emblazoned in a large red "tracker"

marker on the bulletin board next to her name during trailer visits, permitting other

inmates, visitors and officers to see. Unlike other inmates, plaintiff's photograph is

required to be posted at every watch station. Her housing location is hi-lighted in red on

BHCF consoles. Her photograph is kept in every area logbook and posted on the walls at

the front gate and in other areas.

46. Her movements within BHCF are required to be logged at each watch station and

reported to the guard tower. The tower must be informed not only where plaintiff is

going but the reason why, depriving her of basic privacy afforded other inmates.

47. During "Code Blue" drills when the entire BHCF facility is locked down, plaintiff's

"tracker" status requires BHCF guards to enter her unit, demand her cell number from

the guard, open her cell door and demand her identification, DIN number and date of

birth. Once this "identification process" is complete and verified, the cell door is

relocked. Plaintiff must then endure the inevitable rumors that she "tried to escape" and

was the cause of the drill.

48. Her "tracker" status has created and continues to create unnecessary tension between

Plaintiff and guards required to engage in these extra duties caused by her status.

Plaintiff has been pulled out of yard, church, mess hall, medication line and visiting

12

rooms when guards have neglected to log her in. She has been verbally reprimanded by BHCF guards for not ensuring they have logged her in or for not ensuring guards have contacted the tower, placing the onus upon Plaintiff to ensure BHFC guards follow their own unwritten rules regarding trackers.

49. Tracker designation has exposed Plaintiff and other tracker inmates to more serious punishment for otherwise minor offenses due solely to their designation. For example, in June of 2000, Plaintiff was informed that, as per defendant LORD, she was no longer employed at Fire and Safety. Plaintiff sought to return Fire and Safety gear in her possession to avoid charges of possessing what could then be considered contraband. When she tried to return the gear, she was ticketed for being "out of place" and placed in Pre-hearing confinement. A "non tracker" inmate issued such a ticket faced a maximum punishment of 30 days keeplock. A "tracker" like plaintiff faced a minimum 30 days up to a maximum of six months keeplock. Although she was subsequently found not guilty of the infraction, unlike non-trackers, her ticket was not expunged and remains on her permanent record.

50. Plaintiff has been denied substantial due process rights with respect to her tracker status. Since her designation and to the present, numerous efforts have been undertaken to obtain information on her designation and to obtain a fair hearing on the propriety of her designation. Such efforts have been ignored and/or disregarded. Her efforts have also resulted in retaliatory actions taken against her.

51. Since her designation, BHCF officials have denied Plaintiff the right to contest her designation in numerous ways. Numerous reasons have been asserted by BHCF. One

reason was that since her status was not a DOCS designation, it was not a proper subject

of a grievance. Most recently, she has been refused the right to contest her designation

by BHCF officials claiming that filing one was unnecessary because another tracker was

contesting her own designation and that plaintiff's rights would be preserved in that

claim.

52. BHCF officials have retaliated against Plaintiff for her efforts to shed this designation.

Shortly after being designated by LORD in 1996, Plaintiff wrote LORD inquiring of this

designation. When Plaintiff received no response from LORD or any other BHCF

officials, she sent inquiries directly to DOCS regarding tracker designation. DOCS

responded that it had no knowledge such a designation and that it was not a DOCS

designation.

53. In retaliation for her inquiries to DOCS, LORD ordered Plaintiff removed from her then

job in laundry and made her a porter. Plaintiff was then wrongfully made the subject of a

NYSIG investigation when someone within LORD'S "inner circle" falsely claimed her

stepfather, her non-existent 13 year-old nephew, or a DOCS maintenance worker had

impregnated Plaintiff.

54. Plaintiff wrote multiple letters to defendants LORD, DOCS and GOURD about her

"tracker" status. DOCS denied having information about it and LORD usually declined

to respond. When she did respond, her response was inconsistent or false. For example,

months after her initial designation, LORD told Plaintiff her designation was due to

DOCS learning of a third party-kited mailing incident involving plaintiff. LORD told

plaintiff if she stayed out of trouble, DOCS would soon forget her and this "whole

14

tracker thing" would fade away in 3-4 months. When Plaintiff's tracker status continued unabated, plaintiff made her inquiries to DOCS, proving LORD'S claim to be false.

55. In late 1998, LORD told Plaintiff that NYSIG was responsible for her designation and that LORD'S hands were tied to remove it. When Plaintiff inquired of NYSIG about this claim, NYSIG officials denied knowledge of such a designation or having conferred it upon plaintiff.

56. In July of 2001, defendant McELROY, then Deputy of Security, sought to change the terminology to "High Profile Inmate". Despite this semantic change, Plaintiff continued and continues to be labeled a "tracker" in documents, conversations and log entries. She is still exposed to unwanted and unwarranted notoriety and arbitrary, capricious rules and punishment.

57. On March 21, 2002, Plaintiff again wrote LORD, requesting all directives, Standard Operating Procedures, memos and any other document relating to "trackers" due to contradictory treatment from BHCF guards regarding obligations as a tracker. LORD informed Plaintiff there were none.

58. On June 15, 2005, a determination was made that by C.O.R.C., the decision making body of DOCS, that "Tracker" status no longer existed at BHCF. Unfortunately, it would seem no one informed officials at BHCF. Despite this determination, nothing changed for Plaintiff and similarly situated inmates at BHCF. She is still referred to as a tracker in log entries and other documents, and still subjected to the stigma, discrimination and "checking in" system. Her pictures are still posted throughout the facility. In effect, BHCF has not followed its own department's decision.

59. As recently as early 2006, Plaintiff tried to file a grievance regarding her tracker status
    but was, again, refused the right to do so. In March of 2007, Plaintiff was informed that
    "tracker" status within the facility was to be discontinued. Upon information and belief,
    it is not believed to be the case. Upon information and belief, trackers have been given
    different designations but are still treated as before.

60. The "tracker" policy at BHFC is discriminatory, constitutes a physical danger to plaintiff
    and all designated inmates and violates Plaintiff's right to equal protection and due
    process. The lack of written protocols regarding how one is so designated makes such
    designation arbitrary and capricious. The lack of written protocols as to how those so
    designated are to be treated subjects plaintiff and all those so designated to arbitrary and
    capricious treatment within the BHFC facility. This designation is discriminatory as it
    applies to only a limited number of female inmates at BHCF. There is no comparable
    designation in DOCS male prisons. (Although DOCS uses the "tracker" term in male
    facilities, it refers to a process materially different from BHCF's and is far less
    burdensome to male inmates. Upon information and belief, a DOCS "tracker" refers to
    DOCS procedure wherein a male inmate is temporarily "tracked" within a facility. Upon
    information and belief, the designation lasts, at most, days. The male inmate is never
    informed of this tracking. The male inmate is not denied privileges or rights due to this
    tracking. The male inmate is not exposed to harsher penalties for violating the same
    rules as other inmates due to this designation.

61. BHCF tracker designation has placed Plaintiff at greater risk to sexual abuse and official
    harassment and misconduct. Upon information and belief, defendant McELROY used

16

his position of authority within the BHFC inmate facility to solicit sexual favors from

"trackers", including plaintiff. McELROY'S position at BHFC gave him power to inflict

punishment upon inmates who refused his sexual solicitations or to reward those inmates

who consented to such solicitations. "Trackers", whose status within the BHFC facility

subjected them to increased penalties for violation of BHFC rules, were more susceptible

to coercive threats made in exchange for sex.

62. In or about April of 2002. Defendant McELROY solicited Plaintiff for sexual favors, a

solicitation that was declined by plaintiff. Shortly thereafter, McELROY's attitude

towards her noticeably changed. Plaintiff had commenced a civil lawsuit against the

state for a slip and fall. As Plaintiff's case reached the trial stage, McELROY took a

special interest in it. When names of potential witnesses were exchanged, one of

plaintiff's witnesses was disclosed to be a BHFC corrections officer, a notice witness

who logged the dangerous condition prior to Plaintiff's fall. McELROY targeted this

officer for harassment in an effort to undermine Plaintiff's civil claim. Upon

information and belief, McELROY made it known to other inmates and staff that he did

not approve of inmates suing his facility. Upon information and belief, his actions were

in retaliation for Plaintiff refusing his sexual advances.

63. Upon information and belief, McELROY had a bogus "investigation" initiated of this

witness/officer by having a false report filed with NYSIG alleging Plaintiff had engaged

in improper and illegal sexual relations with the witness. That upon information and

belief, McELROY did this to intimidate and threaten this witness from testifying

favorably for Plaintiff. McELROY used a threat of a criminal investigation and possible

17

criminal prosecution or internal punishment to try to derail Plaintiff's civil claim against
the state.

64. A NYSIG agent conducted an unscheduled interview at BHCF with Plaintiff in her cell.
The target of this "internal investigation" was Plaintiff's witness. The NYSIG agent
questioned Plaintiff almost exclusively on her "relationship" with the witness and his
"role" in her upcoming trial against the state. This interview occurred in total disregard
to Plaintiff's rights, as she had legal counsel in a pending matter. She was questioned as
to why this guard was a named witness, what he would testify to, whether she intended
to call him into court and similar questions relating to the pending litigation.

65. At the conclusion of this interrogation, Plaintiff's cell was searched and personal items
removed in a manner contrary to DOCS rules. Upon information and belief, no evidence
of any improper relationship was found.

66. Shortly thereafter, McELROY ordered defendants ROGER and BARCLAY to conduct a
"four bag" compliance search of Plaintiff's cell. There was no such thing in BHCF or
DOCS directives as a "four bag" compliance search. Upon information and belief,
Plaintiff was the first, last and sole inmate to undergo a "four bag" compliance search
and suffer punishment for non-compliance. Such a search was patently arbitrary,
capricious and wholly subjective since there were no directives providing standards for a
particular sized "bag" to be used or other written protocols needed to ensure proper
compliance with standardized rules.

67. Defendants ROGER and BARCLAY "bagged" and removed everything in Plaintiff's
cell. During their "bagging", they commented about inmates "who filed lawsuits" and

18

inmates who "piss off" "the man at the top", references to McELROY. ROGER and

BARCLAY conducted their search in a manner designed to instill fear in Plaintiff

derogatory and/or offensive comments as they searched through plaintiff's personal

items.

68. After completing their search, ROGER and BARCLAY filed multiple reports, including

an "inmate misbehavior report" wrongfully accusing Plaintiff of possessing

"contraband". The alleged "contraband" included medically prescribed pain medication,

a heating pad and a hot water bottle provided to Plaintiff by BHCF's medical staff. It

included band-aids, black panties, boxer shorts, wire bras, extension cords and fire

extinguisher seals and pins. Plaintiff, a fire and safety employee within BHCF was

wholly authorized to possess these items.

69. This initiated action to torture Plaintiff by deliberately depriving her of necessary

medications and instruments used to address her severe and chronic physical pain.

Defendants BARCLAY and ROGER confiscated all Plaintiff's medically prescribed pain

relief items, including pain medication, electric heating pad, hot water bottle and TINNS

unit, all medically prescribed to treat her severe and chronic shoulder pain, TMJ and

arthritic condition. She was deprived of specialty items approved by the BHCF medical

staff to assist with her disabilities such as a special pillow and a secondary mattress. The

deliberate and unjustifiable confiscation of these items was deliberately intended to and

did cause Plaintiff prolonged, unabated and continuous pain and suffering for weeks

leading up to and including her civil trial. I Plaintiff became sleep deprived and severely

depressed. If plaintiff moved the wrong way in her sleep, she would awake in intense

19

pain. The result is that plaintiff would only get short amounts of sleep, literally minutes at a time, before waking up in pain. To further assist in her sleep deprivation, McELROY ordered plaintiff's overhead cell lights turned on 24 hours a day.

70. After the seven hours "four bag" search was completed, Plaintiff was left alone with defendant MURRAY, a guard known by BHCF officials to be sexually abusive to inmates. While alone with plaintiff, MURRAY sexually fondled plaintiff, conduct reported to but wholly ignored by McELROY, LORD and BHCF officials.

71. McELROY ordered inmate cells adjacent to Plaintiff searched and made sure those inmates were told that these searches were due to Plaintiff, action designed to encourage violence against her. BARCLAY "put out the word" that Plaintiff had given up names of inmates to be targeted by BHCF guards, a further effort to encourage violence against Plaintiff.

72. An expedited, sham hearing was held at which Plaintiff was denied her right to call exculpatory witnesses to testify on her behalf to show items she possessed were authorized. Upon information and belief, an internal hearing officer found her guilty, a finding ordered by McELROY. Plaintiff was disciplined by 1-day pre-hearing confinement, 30 days keeplock, loss of packages, loss of commissary and, more importantly, loss of phone privileges for 30 days, including phone privileges to legal counsel. Plaintiff was also removed from her BHCF job.

73. Plaintiff appealed this decision. The appeal was denied in a manner that denied her due process and proper review. Upon information and belief, the denial was ordered and/or directed by McELROY.

20

74. The acts of retaliation against plaintiff and violate her legal rights continued when, in preparation for a scheduled legal visit, Plaintiff was threatened by guards regarding bringing legal papers to her legal visit, in contravention to DOCS regulations.

75. Defendant JACKSON was informed that plaintiff was bringing in legal documents. JACKSON then read Plaintiff private papers, a violation of DOCS rules. When she finished, JACKSON told Plaintiff her legal papers were not legal papers in her opinion, and ordered plaintiff to withhold them from counsel. JACKSON then counted the pages and warned Plaintiff to return with the same number of pages.

76. Under DOCS rules, inmates are required to obey "direct orders" from facility officials under penalty of internal punishment. JACKSON'S direct order left plaintiff to choose between violating a direct order or exercising her legal right to turn over and discuss legal documents with legal counsel. JACKSON'S direct order was intended to deny Plaintiff rights regarding her wrongful mistreatment within BHCF at the hands of BHCF officials.

77. Upon information and belief, JACKSON'S actions were at the behest, direction and order of McELROY and intended to ensure that McELROY'S brutal and illegal maltreatment of plaintiff was not interfered and went unreported.

78. Shortly thereafter, a hearing was held during which McElroy testified as a witness regarding plaintiff's status. During questioning under oath relating to plaintiff's tracker status, McELROY perjured himself, calling her a High Profile Inmate. Plaintiff was not, at that time, considered a High Profile Inmate..

79. In early 2004, plaintiff reported defendant ROBINSON, upon information and belief, a

21

"friend" of McELROY, for sexual misconduct and molestation. At the time of her

report, upon information and belief, DOCS and BHCF officials already knew

ROBINSON had engaged in illegal sexual behavior with female inmates.

80.  Upon information and belief, shortly thereafter, defendant McELROY became acting

Superintendent at BHCF. Within days of his new status, he ordered another arbitrary

"four-bag" search of Plaintiff's cell in retaliation for her complaint against his friend

ROBINSON. Upon information and belief, the actions were also intended to intimidate

other inmates reporting similar incidents involving McELROY. Plaintiff was found two

bags over the limit. McELROY ordered her ticketed for possessing contraband, i.e., the

excess items over two bags.

81.  In or about April 9, 2004, McELROY ordered Plaintiff removed from her cell, taken to

SHU and had her cell searched once again. Upon information and belief, prior to this

search McELROY ordered defendant SMITH to charge Plaintiff with possessing

"contraband" so as to justify McELROY ordering Plaintiff to administrative segregation

in the Special Housing Unit (SHU) as a security risk. He ordered plaintiff to SHU

pending a hearing on SMITH'S charges.

82.  During this search of Plaintiff's cell, numerous items of her personal property were

deliberately or negligently damaged and/or destroyed, legal documents removed and

believed destroyed (Despite multiple requests, BHCF officials have not returned

plaintiff's legal papers removed at the time). BHCF officials have refused to

acknowledge, much less accept, responsibility for the damaged and/or destroyed items of

personal property.

83.  Upon information and belief, McELROY ordered the unwarranted search and false

charges filed against Plaintiff in order to make plaintiff into a "high profile inmate" in

order to justify his false testimony, and to isolate her in SHU to inflict physical

punishment upon plaintiff and destroy her, up to then, exemplary prison record. Upon

information and belief, it was McELROY'S intent to damage plaintiff's BHCF record in

order to extend her stay and to ensure plaintiff would become and remain a "high profile

inmate". A "high profile" inmate is dependent upon the superintendent to determine

where she works within the facility. She is denied certain privileges, employment and

housing with the status. Such an inmate loses all chance at early release or clemency.

84.  McELROY knew Plaintiff's medical condition, as disclosed by his prior punitive actions

to deprive her of pain medication and equipment. McELROY took action to punish

Plaintiff and ensure she would suffer extreme discomfort in SHU for an extended period

of time. SHU cells are damp, musty and cold, conditions known to aggravate Plaintiff

physical ailments.

85.  Once isolated in SHU, McELROY took steps to ensure plaintiff would suffer deliberate

medical neglect. Upon information and belief, to do this, he needed the complicity of the

medical department and defendant GOLDSTEIN. Upon information and belief, this

resulted in plaintiff being denied necessary medication for pain and her other physical

ailments for extended periods of time.

86.  Upon information and belief, while first placed in SHU, Plaintiff was intentionally

denied and/or had withheld from her all medically prescribed pain medication and pain

reducing equipment, actions that required knowledge and consent of defendant

GOLDSTEIN. Upon information and belief, this intentional withholding of pain medication and instruments from plaintiff was done without medical cause, as plaintiff continued to experience intense pain from her shoulder and other injuries. Along with her medication, plaintiff was denied ice for her shoulder, batteries for her medically prescribed TENNS unit, her medically authorized second mattress to assist her in sleeping on her painful shoulder and second pillow. The result was that plaintiff rarely slept continuously for more than minutes at a time, her sleep being frequently interrupted by sharp, aching pain from her arthritic shoulder whenever she moved. Plaintiff was denied pain medication for months while in SHU.

87. Plaintiff was also deliberately denied her asthma pump, an act of deliberate neglect that almost resulted in serious injury, if not death, when, in early May 2004, she suffered a severe asthma attack while in SHU but was unable to alert the guards due to her inability to breath. Plaintiff avoided serious injury when other inmates who heard plaintiff desperately banging her cell walls in distress eventually alerted guards. She was rushed to a hospital facility and treated. Incredibly, she was returned to the same SHU cell, again, without her asthma pump and suffered a second asthma attack four hours after returning.

88. Despite knowing her medical condition impaired communication between Plaintiff and guards, no changes were made to ensure Plaintiff could communicate with guards in the event of another asthma attack. No alternative method of communication was instituted. Plaintiff continued to be denied her asthma pump.

89. Upon information and belief, McELROY made it well known to SHU guards that

24

plaintiff was in SHU for displeasing McELROY and was to be treated accordingly while in SHU. The result was for the guards to engage in an accepted practice at BHCF to ignore medical modified restraints orders issued to plaintiff. BHCF medical officials issued plaintiff a modified restraint order for her chronic and severe shoulder injury. These orders are issued to inmates suffering serious injury or rehabbing from injury purportedly to ensure the injury is not exacerbated by restraints. Upon information and belief, McELROY directed BHFC guards in SHU to ignore Plaintiff's modified restraint order. The result was to cause further injury to plaintiff.

90. Thus, whenever Plaintiff had to be moved from SHU, the guards would ignore her modified restraint order despite her reminding them of it. Plaintiff continued to be restrained by use of heavy box shackles that placed enormous stress on her painful and damaged shoulder. The weight of the shackles alone caused exacerbation of her shoulder pain at a time when Plaintiff was being deliberately denied pain medication and equipment. Upon being unshackled, Plaintiff would be in excessive and intolerably severe pain for literally hours, further causing her to be deprived of sleep and comfort. This deliberate form of torture continued unabated for months.

91. Further, upon information and belief, McELROY ordered SHU guards escorting Plaintiff during moves, to ignore BHCF rules requiring assistance to a shackled inmate carrying items needed to be moved with her. The result was further injury to plaintiff when, on or about April 21, 2004, in full box shackle restraint, Plaintiff was compelled to carry a legal file to an internal hearing arranged by McELROY to continue plaintiff in SHU on her "contraband" charge. During this move, Plaintiff was caused to trip and fall on

broken pavement on the path she was taken.

92. After her fall, the escorting guard grabbed Plaintiff by her injured arm and violently tried

to yank plaintiff to her feet rather than assisting plaintiff up, causing immediate and

severe pain and further damage to her then recently surgically repaired arthritic and

painful shoulder. The incident caused Plaintiff to re-injure her shoulder as well as to

suffer additional injuries. These included a broken finger that initially was undiagnosed

and nerve damage to her elbow and arm from her arm being pulled for which she has had

multiple surgeries. These surgeries left deep keloid scarring approximately 7 inches long

and ½ inch wide. BHCF Physicians have recommended a plastic surgeon and

neurologist examine plaintiff but GOLDSTEIN has ignored such recommendations.

Plaintiff's requests for a second opinion for her elbow have also been denied despite the

obvious poor results and disastrous scarring from the facilities hand specialist. Plaintiff

continues to experience numbness and pain in both hands.

93. Plaintiff also injured her right ankle in the fall. Although x-rays taken were negative,

plaintiff continued and continues to have pain in her ankle to the present time. Although

medically recommended that a ct scan and/or MRI be taken of plaintiff's ankle,

GOLDSTEIN and BHCF medical department has refused to act on these

recommendations. Plaintiff continues to be denied proper medical care and has suffered

material medical neglect.

94. Plaintiff's new injuries did not halt the ongoing torture imposed upon her by McELROY.

Despite obvious pain from her injuries incurred, upon information and belief,

McELROY deliberately delayed sending Plaintiff for medical treatment and continued to

deny her pain medication and equipment.

95. Upon information and belief, Plaintiff's injuries were the direct result of McELROY'S retaliatory actions ordered in violation of BHCF rules. Ignoring plaintiff's modified restraint order, having SHU treat plaintiff in a brutal and inhumane manner and denying her needed medical treatment and medication all resulted in injury and harm to plaintiff. His retaliatory campaign against Plaintiff derived from her lawful complaints of wrongdoing within the facility, her lawful rejection of his sexual advances and continuation of her civil suit. He was able to do so based on his position of authority within the facility, plaintiff's designation as a tracker and the lack of sufficient safeguards in place to protect plaintiff from his brutal and inhumane treatment.

96. The hearing to determine the propriety of plaintiff's administrative segregation was a sham hearing. Defendants McELROY, SMITH and NOTARO gave knowingly false testimony under oath. Furthermore, McELROY submitted "evidence" consisting of a "secret" tape recording purportedly containing "reliable" information from four "witnesses" who purportedly provided "specific and detailed information" relating to undisclosed violations allegedly committed by Plaintiff. The specific violations allegedly contained on this tape were withheld from Plaintiff. Plaintiff was refused any information on these secret violations and denied the opportunity or ability to refute the allegations or confront those alleged to have made them.

97. Plaintiff was refused permission to listen to the tape, was denied a transcript of it and never informed of the "specific and detailed information" contained in it. Upon information and belief, McELROY falsely represented to the hearing officer that the

27

tape's contents could not be revealed to plaintiff because they were part of an ongoing "IG investigation", a claim found to be false. Plaintiff was detained in administrative segregation specifically due to McELROYS deceit and wrongfully retaliation.

98. On August 4, 2004, Plaintiff was finally released from administrative segregation having spent a total of 119 days, almost four months. Plaintiff's efforts to appeal her wrongful detention were ignored.

99. The deliberate, malicious and willful acts of medical neglect, torture, threats, isolation and similar retaliatory actions wantonly engaged in by the above-named defendants caused plaintiff terrible pain, emotional distress and terror. On numerous occasions during her stay in SHU, plaintiff feared that she would either die or be killed. The deliberate, malicious and willful acts of retaliation by McELROY succeeded in causing plaintiff to refrain from exercising rights available to her to petition her government by filing a notice of claim or notice of intent to file a claim. This was due to her fear that such action would cause further willful and wanton acts of malicious retaliation against her by McELROY.

100. Plaintiff has continued to be designated a tracker despite the fact that no new trackers have been designated since LORD retired. Existing trackers have remained "trackers" without any action from the current administration to address the legitimate concerns of those so designated until very recently.

101. Throughout her stay at BHCF, Plaintiff has been subjected to and complained of sexual harassment, complaints almost wholly ignored. In addition to incidents referenced above, plaintiff has been subjected to additional sexual harassment by BHCF guards.

102. Shortly after her release from SHU in August of 2004. Plaintiff witnessed an altercation between female inmates. Despite being a non-participant in the altercation and wholly uninjured from it, defendant BALL ordered defendant ARMSTRONG to photograph plaintiff's injuries over her objection. Plaintiff had not been injured. Despite this fact, she was compelled to have photographs taken of her in various stages of undress to "document" non-existent injuries. Plaintiff was ordered to provide a urine sample and held for three (3) days in pre-hearing confinement pending an investigation of the incident. Again, during this confinement, Plaintiff was denied her pain medication.

103. These photographs of plaintiff have made their way around the facility by guards. BHCF and DOC officials have wholly ignored plaintiff's numerous requests for their return and destruction.

104. Nor are sexual assault and harassment against inmates at BHCF restricted to male guards. Upon information and belief, defendant DUNCAN is black, lesbian, and employed at BHCF as a guard. Upon information and belief, BHCF authorities are aware of DUNCAN'S sexual orientation and preference for young, white inmates. Despite this knowledge, BHCF officials allow DUNCAN to unilaterally decide upon and engage inmates in strip searches when leaving the visitors' room. DUNCAN has compelled Plaintiff to submit to multiple strip-searches, almost always done in highly irregular, sexually explicit and prurient ways, in violation of BHCF rules and regulations.

105. The number and manner of such searches by DUNCAN compelled Plaintiff to complain directly to defendant PEREZ of this ongoing sexual assault and harassment done under the guise of a security search in the hopes that PEREZ would be able to limit or stop

them without causing DUNCAN to retaliate against plaintiff. PEREZ promised Plaintiff that DUNCAN'S searches would stop.

106. Upon information and belief, no formal or informal action was taken to restrict such searches in general or to advise DUNCAN to limit such searches and do them under existing protocols. Upon information and belief, all that was done was that DUNCAN was told of Plaintiff's complaints. In retaliation, DUNCAN increased the frequency and duration of plaintiff's strip-searches. DUNCAN has required plaintiff to strip naked and squat in various positions multiple times in a manner plainly violating BHCF protocol. DUNCAN has squeezed, fondled and grabbed plaintiff's breasts during searches.

107. Upon information and belief, in order to deflect from her actions, DUNCAN has gotten other female guards to retaliate against plaintiff for her complaints. In particular, Defendant WILLIAMS has compelled plaintiff to undergo multiple strip-searches solely in retaliation for plaintiff's complaints to PEREZ.

108. DUNCAN has retaliated against plaintiff in other ways for her complaints against her. As pointed out above, plaintiff suffers severe, debilitating migraine headaches and is usually able to take her medication anywhere within the facility. DUNCAN has set her own policy of prohibiting plaintiff from bringing her medication into the visiting room during visits. When DUNCAN is not on duty, this is usually not a problem. When DUNCAN is on duty, plaintiff must keep her medication out of the visiting room. Should plaintiff begin to develop a migraine headache during a visit, DUNCAN has made it known to plaintiff that she will not be permitted to retrieve her medication and return to the visiting room. DUNCAN has informed plaintiff that if she leaves the

30

visiting room to take her medication, DUNCAN will not permit plaintiff to return to
continue her visit.

109. No SOP or protocol prohibits plaintiff from having her medication with her. There is no
authority for DUNCAN to prohibit medically prescribed medication being taken into a
visiting area. Yet, DUNCAN continues to enforce this policy against plaintiff.
DUNCAN'S "policy" was reported to PEREZ, who promised to provide plaintiff with a
medical note allowing her to have the medication during visits (despite the fact that no
note is necessary since there is no violation of any rules to have such medication in the
visiting room). No such note has been provided plaintiff and Plaintiff is still unable to
take migraine headache medication into the visitor's area when DUNCAN is there.

110. Known retaliatory actions taken against Plaintiff by supervisory BHCF officials such as
LORD and McELROY have impacted negatively upon plaintiff's standing within the
facility, resulting in non-supervisory personnel engaging in inappropriate conduct against
plaintiff to gain favor with LORD and McELROY. Refusal of supervisory BHCF
officials, such as LORD, McELROY and PEREZ to protect plaintiff from retaliation for
her complaints have resulted in BHCF staff to view plaintiff as a troublemaker officially
sanctioned to be mistreated and abused. Plaintiff's complaints to BHCF staff are ignored
or result in further retaliation against her. Plaintiff has come to fear reporting abuse out
of fear of reprisals.

111. For example, plaintiff wrote defendant PEREZ describing a potential violent situation at
BHCF. In response, plaintiff received a letter from SCHNEIDER threatening to have
plaintiff placed in SHU should she ever write PEREZ again.

112. BHCF officials have used plaintiff's medical condition not only as a means to retaliate against, torture and punish plaintiff by withholding necessary pain medication, but also to discriminate against her in retaliation. Plaintiff has a full medical restriction order from BHCF medical staff for her chronic and painful injuries. The order prohibits her from "pushing", "pulling" or "lifting". Prior to July 13, 2005, Plaintiff could ask other inmates to assist in carrying her packages from the package room and had use of a cart to transport heavy items from commissary.

113. On July 13, 2005, defendant GOLDSTEIN implemented a new policy that prohibited inmates with medical restrictions from having "anyone assist them in carrying packages and cannot use a cart. If they cannot lift it, they shouldn't buy it." Upon information and belief, this new policy was directed at and targeted Plaintiff. It plainly discriminates against plaintiff and similarly situated inmates with physical disabilities.

114. Plaintiff has endured other forms of retaliatory discrimination. She has applied to honors programs within the facility and been turned down specifically due to her disabilities. These programs openly discriminate against inmates with medical restrictions from even participating in them.

115. Plaintiff's "tracker status" continues to single plaintiff being out and deny her rights afforded other inmates. For example, when plaintiff's father passed away, on or about February 4, 2007, plaintiff was to be transported to her father's wake. Upon information and belief, due to her tracker status, the deputy of security ordered three guards to transport plaintiff to her father's wake rather than the usual two used in "non tracker" situations. Due to her tracker status, prior to leaving for the wake, guards were ordered

to keep plaintiff shackled throughout the visit, an order contrary to custom and practice whereby grieving inmates are usually allowed to be partially unshackled to greet and console relatives and pay their respects to the deceased. Plaintiff was also denied food and water throughout most of the visit, whereas it is the custom and practice to stop and purchase something for the inmate to eat. Upon information and belief, this was due solely to her tracker status and/or in retaliation for her complaints about her tracker status.

116. That as a direct and proximate result of said acts mentioned above plaintiff LAURIE L. KELLOGG suffered the following injuries and damages;

   a.   Violation of her constitutional rights under the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution a) to speak freely, publicly and critically about government malfeasance, actions, statements and policies without fear of retaliation and retribution by those same government officials; b) to petition the government for a redress of grievances; c); to be free from cruel, unusual and retaliatory punishment d) to due process of law; e) to access to legal counsel.

   b.   Violation of her rights under the Americans with Disabilities Act, 42 U.S.C §§ 12101et seq. and Section 504 of the Rehabilitation Act, 29 U.S.C. §794

   c.   Violation of her rights under the New York State Constitution and statutes to speak freely, publicly and critically about government malfeasance, actions, statements and policies without fear of retaliation and retribution by those same government officials; b) to petition the government for redress of grievances c); to be free from cruel, unusual and retaliatory punishment d) to due process of law; e) to

33

access to legal counsel.

 d. Personal injury caused by the actions of state officials;

 e. Emotional and psychological trauma and suffering;

117.The actions of the defendants violated the following clearly established and well settled

 federal constitutional rights of plaintiff LAURIE L. KELLOGG:

 a. Plaintiff's rights under the First Amendment to speak freely, publicly and

 critically about government malfeasance, actions, statements and policies without fear

 of retaliation and retribution by those same government officials criticized;

 b. Plaintiff's rights under the First Amendment to petition the government for a

 redress of grievances without fear of retaliation and retribution by government

 officials;

 c. Plaintiff's rights under the Fifth Amendment to not be deprived of property

 without due process of law;

 d. Plaintiff's rights under the Eighth Amendment to be free from cruel, unusual and

 retaliatory punishment

 e. Plaintiff's rights under the Fourteenth Amendment as a citizen of the United

 States to due process and equal protection of the law.

## AS AND FOR A FIRST CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

118.Paragraphs 1 through 114 are incorporated herein by reference as though fully set forth.

 That Plaintiff claims damages for injuries set forth above under the Civil Rights Act of

 1871, 42 U.S.C. section 1983 under color of law against the above named defendants for

the wrongful retaliation against her for the exercise of her rights under the First and

Fourteenth amendments to the United States Constitution to free speech and to petition

her government without fear of retaliation thereby entitling Plaintiff to compensatory

damages, punitive damages, equitable and injunctive relief.

## AS AND FOR A SECOND CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

119. Paragraphs 1 through 114 are incorporated herein by reference as though fully set forth.

120. That Plaintiff claims damages for injuries set forth above under the Civil Rights Act of

1871, 42 U.S.C. section 1983 under color of law against the above named defendants for

the wrongful violation of her rights under the Fifth Amendment and Fourteenth

Amendment to not be deprived of property without due process of law thereby entitling

Plaintiff to compensatory damages, punitive damages, equitable and injunctive relief.

## AS AND FOR A THIRD CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

121. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

122. That Plaintiff claims damages for injuries set forth above under the Civil Rights Act of

1871, 42 U.S.C. section 1983 under color of law against the above named defendants for

the wrongful violation of her rights under the Eighth and Fourteenth Amendment to be

free from sexual abuse, sexual harassment, cruel and unusual punishment, and

retaliation, which rights are guaranteed her by reason of the Eighth Amendment to the

United States Constitution, 42 U.S.C. §1983, thereby entitling Plaintiff to compensatory

35

damages, punitive damages, equitable and injunctive relief.

## AS AND FOR A FOURTH CAUSE OF ACTION AS AGAINST DEFENDANTS GOURD, LeCLAIRE, HEADLY BERNARDI MASTERSON WRIGHT LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

123. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

124. That Plaintiff claims damages for injuries set forth above under the Civil Rights Act of

1871, 42 U.S.C. section 1983 under color of law against the above named defendants for

the wrongful violation of her rights under the Fourteenth Amendment as a citizen of the

United States to due process and equal protection of the law thereby entitling Plaintiff to

compensatory damages, punitive damages, equitable and injunctive relief.

## AS AND FOR A FIFTH CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

125. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

126. That Plaintiff claims damages for injuries set forth above for the wrongful violation

under the New York State Constitution Article I §, 5 prohibiting cruel and unusual

punishments thereby entitling Plaintiff to compensatory damages, punitive damages,

equitable and injunctive relief.

## AS AND FOR A SIXTH CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

127. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

128. That Plaintiff claims damages for injuries set forth above for the wrongful violation

under the New York State Constitution Article I §, 6 right to counsel in civil actions

thereby entitling Plaintiff to compensatory damages, punitive damages, equitable and

injunctive relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

129.Paragraphs 1 through 123 are incorporated herein by reference as though fully set forth.

130.That Plaintiff claims damages for injuries set forth above for the wrongful violation of

plaintiff's right to free speech under the New York State Constitution Article I §, 8

thereby entitling Plaintiff to compensatory damages, punitive damages, equitable and

injunctive relief.

## AS AND FOR A EIGHTH CAUSE OF ACTION AS AGAINST DEFENDANTS LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

131.Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

132.That Plaintiff claims damages for injuries set forth above for the wrongful violation of

Plaintiff's right to equal protection of the law under the New York State Constitution

Article I §, 11 thereby entitling Plaintiff to compensatory damages, punitive damages,

equitable and injunctive relief.

## AS AND FOR A NINTH CAUSE OF ACTION AS AGAINST DEFENDANTS GOURD, LeCLAIRE, HEADLY BERNARDI, MASTERSON, WRIGHT, LORD, PEREZ, MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG, GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND JACKSON

133.Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

134. That plaintiff claims damages for injuries set forth above under the Civil Rights Act of

   1871, 42 U.S.C. § 1986 under color of law against individuals who knew or had reason

   to know of the conspiracy by DOC officials to deprive plaintiff of constitutional rights

   mentioned above and who had the power and ability to prevent same by reasonable

   diligence but who neglected and/or refused to do so.

135. Plaintiff suffered injuries and damages due to this failure to act thereby entitling Plaintiff

   to compensatory damages, punitive damages, equitable and injunctive relief.

<u>AS AND FOR A TENTH CAUSE OF ACTION AS AGAINST DEFENDANTS GOURD,
LeCLAIRE, HEADLY, BERNARDI, MASTERSON, WRIGHT, LORD, PEREZ, AND
GOLDSTEIN</u>

136. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

137. That Plaintiff's rights to adequate medical care and treatment as guaranteed her by

   reason of the Eighth Amendment to the United States Constitution, 42 U.S.C. §1983,

   thereby entitling Plaintiff to compensatory damages, punitive damages, equitable and

   injunctive relief.

<u>AS AND FOR A ELEVENTH CAUSE OF ACTION AS AGAINST DEFENDANTS
GOURD, LeCLAIRE, HEADLY BERNARDI MASTERSON WRIGHT LORD, PEREZ,
MCELROY, SCHNEIDER, GOLDSTEIN, BALL, SMITH, MURRAY, ARMSTRONG,
GARY NOTARO, BARCLAY, ROGER, DUNCAN, WILLIAMS, ROBINSON AND
JACKSON</u>

138. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

139. That Plaintiff's rights to equal treatment and to be free from discrimination premised

   upon her race, which rights are guaranteed her by reason of the Fourteenth Amendment

   to the United States Constitution, 42 U.S.C. §1983, thereby entitling Plaintiff to

   compensatory damages, punitive damages, equitable and injunctive relief.

## AS AND FOR A TWELFTH CAUSE OF ACTION AS AGAINST DEFENDANTS DOCS GOURD AND LECLAIRE

140. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

141. That prior to the dates contained herein, upon information and belief, defendants developed, maintained or knowingly tolerated policies, customs and practices in BHCF exhibiting deliberate indifference to the Constitutional rights of persons within their custody and care resulting in violations of plaintiff's rights.

142. Upon information and belief, it was unwritten, established policy, custom and practice of DOCS officials, implemented through GOURD and LECLAIRE and carried out DOCS to train and allow Corrections Officers in the use of brutality and inhumane treatment as a means to control and govern inmates; That this training acquiesces in brutality by referring to inmates as animals and suggesting that they be treated as such; have set up procedures designed to insure that certain inmate complaints of official misconduct and/or brutality are deliberately and inadequately investigated and documented; have set up procedures that can ignore or minimize inmate complaints of official misconduct or acts of brutality and to insure that grievance procedures of such misconduct are rendered useless to address such misconduct; to endorse or allow to flourish the wanton use of official powers to harass, intimidate and retaliate against inmates, including plaintiff, who complained of misconduct by DOCS officials.

143. That such policy was implemented and followed in BHCF.

144. The actions, conduct, policy and practice in this respect and as implemented herein resulted violated plaintiff's rights under the First, Eighth and Fourteenth Amendments to the Constitution of the United States as allowed under the Civil Rights Act of 1871, 42

39

U.S.C. § 1983, the Constitution of the State of New York, as well as the laws of same.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION AS AGAINST DEFENDANTS DOCS AND LeCLAIRE

145. Paragraphs 1 through 110 are incorporated herein by reference as though fully set forth.

146. That prior to the dates contained herein, upon information and belief, defendants developed, maintained or knowingly tolerated policies, customs and practices in BHCF exhibiting deliberate indifference to the Constitutional rights of persons within their custody and care resulting in violations of plaintiff's rights.

147. Upon information and belief, it was unwritten, established policy, custom and practice of DOCS officials, implemented through GOURD and carried out DOCS to train and allow Corrections Officers in the use of brutality and inhumane treatment as a means to control and govern inmates; That this training acquiesces in brutality by referring to inmates as animals and suggesting that they be treated as such; have set up procedures designed to insure that certain inmate complaints of official misconduct and/or brutality are deliberately and inadequately investigated and documented; have set up procedures that can ignore or minimize inmate complaints of official misconduct or acts of brutality and to insure that grievance procedures of such misconduct are rendered useless to address such misconduct; to endorse or allow to flourish the wanton use of official powers to harass, intimidate and retaliate against inmates, including plaintiff, who complained of misconduct by DOCS officials.

148. That such policy was implemented and followed in BHCF.

149. The actions, conduct, policy and practice in this respect and as implemented herein resulted violated plaintiff's rights under the First, Eighth and Fourteenth Amendments to

the Constitution of the United States as allowed under the Civil Rights Act of 1871, 42

U.S.C. § 1983, the Constitution of the State of New York, as well as the laws of same.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION AS AGAINST DEFENDANTS DOCS, HEADLY, BERNARDI AND MASTERSON

150. Paragraphs 1 through 117 are incorporated herein by reference as though fully set forth.

151. That prior to the dates contained herein, upon information and belief, defendants

developed, maintained or knowingly tolerated policies, customs and practices in BHCF

discriminating against inmates with physical disabilities and or to allow retaliatory

discrimination through the use of BHCF programs in violation of plaintiff's rights under

the First, Eighth and Fourteenth Amendments to the Constitution of the United States as

allowed under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Constitution of the

State of New York, as well as the laws of same..

## AS AND FOR A FIFTEENTH CAUSE OF ACTION AS AGAINST DEFENDANTS DOCS AND WRIGHT

152. Paragraphs 1 through 117 are incorporated herein by reference as though fully set forth.

153. That prior to the dates contained herein, upon information and belief, defendants

developed, maintained or knowingly tolerated policies, customs and practices that have

been implemented at BHCF that have allowed medical neglect by allowing medical

decisions relating to inmates to be decided by non-medical personnel; have allowed

employees to deliberately ignore medical restriction orders without security justification

without explanation, justification or recourse; have allowed cessation of pain medication

and pain controlling instruments by officials without medical knowledge, background, or

medical cause or approval and without allowing inmate to have medical review of the

41

decision in violation of plaintiff's rights under the First, Eighth and Fourteenth
Amendments to the Constitution of the United States as allowed under the Civil Rights
Act of 1871, 42 U.S.C. § 1983, the Constitution of the State of New York, as well as the
laws of same..

154. That such policy was implemented and followed in BHCF.

155. WHEREFORE, plaintiff prays that this Court grant judgment to her containing the
following relief:

  a. Assume pendent party and pendent claim jurisdiction;

  b. As against all Defendants, awarding Plaintiff compensatory damages;

  c. As against all individually named Defendants, awarding Plaintiff punitive damages;

  d. As against all Defendants, awarding Plaintiff the following permanent equitable and
  injunctive relief:

              i.  To remove Plaintiff from "Tracker" status, as having been designated
                  in a retaliatory, arbitrary and capricious manner, serving no legitimate
                  penal function and rendering Plaintiff more vulnerable and susceptible
                  to sexual and physical abuse, arbitrary and capricious rules and
                  punishments and inmate harassment;

             ii.  To expunge from Plaintiff's records all "tracker" related disciplinary
                  tickets;

            iii.  To take affirmative steps to eliminate sexual abuse, coercive demands
                  for sexual favors, and quid pro quo for sex demanded of inmates such
                  as plaintiff and similarly situated inmates by BHFC officials,

42

employees and agents, including but not limited to, installing
additional video cameras and/or audio recording equipment in SHU to
discourage attempts at inappropriate sexual encounters; insuring that
complaints of sexual abuse and sexual harassment by inmates against
BHCF officials, employees and agents and retaliation reported by
inmates for such complaints are investigated by an independent agency
whose findings can be appealed;

iv.  To take affirmative steps to address and eliminate sexual harassment
and abuse of plaintiff and similarly situated inmates by the use of
deliberately excessive and prurient strip searches by BHFC officials,
employees and agents, including but not limited to, issuing specific
protocols as to when such invasive searches are to be conducted;
requiring written reports whenever such searches are used in order to
track the track the BHFC officials, employees and agents conducting
such searches, the inmates being subjected to such searched; requiring
a superior officer approve such searches and be present during such
search to ensure compliance with established protocol; permitting an
inmate the right to request a different official conduct such search than
the one seeking it; Having complaints of excessive use of such
searches against BHCF officials, employees and agents by inmates and
retaliation for reporting such conduct investigated by an outside agency
whose result can be appealed.

43

v.  To take affirmative steps to limit or terminate the power of non-
medical facility personnel to withhold or remove prescribed pain and
other necessary prescribed medications or instruments from inmates;
requiring written medical approval or a medical examination of the
inmate within 24 hours to determine the propriety of the action or the
return of the medication; Requiring prescribed medication to be taken
into the visiting room during visits or while an inmate is in SHU and
requiring the removal of such medication to require a report explaining
the basis for such removal.

vi.  To restore full, permanent and long-term medical restrictions with
respect to Plaintiff's shoulder conditions and injury and to provide
Plaintiff without delay all necessary medical supplies such as hot water
bottle, extra pillow, extra mattress, medications, and any other required
medical intervention so as to prevent debilitating pain and further
injury to Plaintiff;

vii.  To address the use of harassing cell searches, by requiring
authorization by a superior officer before engaging in a cell search or
an explanation as to why such authorization was not obtained in
advance; requiring a written report detailing the reason for the search;
requiring records kept regarding the number of cell searches conducted
of each inmate's cell, the officers involved in the search and the
reasons for conducting each search to ensure records are kept of

44

harassment using such searches.

viii. To take affirmative steps to address the medical neglect of plaintiff by requiring an independent doctor's opinion of needed treatment when there is a disagreement between specialists paid for by the state and the facility medical staff as to a course of treatment;

ix. Action to address the existing communication problems within SHU, to require an alternative method of communications by an inmate in SHU to the guard.

x. Action to ensure that inmate grievances are documented and properly and fairly heard preferably by an outside, third party prisoner's rights organization;

xi. Action expunging from plaintiff's record all tickets issued by or at the direction of McELROY;

xii. Action returning plaintiff to her position at Fire and Safety;

xiii. Action returning plaintiff's confiscated legal papers and prohibit future removal of legal papers from plaintiff's cell and similarly situated inmates by guards.

xiv. Action returning or compensating plaintiff for her property taken and not returned or damaged or destroyed during the searches:

xv. Action prohibiting the punitive use of illuminated overhead ceiling lights twenty-four hours per day to disrupt sleep;

xvi. Action vacating the discriminatory policy prohibiting plaintiff from

being assisted in carrying items from commissary or using a cart;

xvii.  Action removing restrictions on the amount of personal property

thereby permitting Plaintiff to maintain all of her personal property,

including legal papers, in her cell;

xviii.  Action to insure Plaintiff's presence during any proposed cell searches,

thereby protecting the confidentiality and preventing

destruction/misplacement of her property and legal materials;

xix.  Action prohibiting officials from ignoring modified restraint orders or

require a written report justifying why such orders were not followed;

b.  As against all defendants, awarding reasonable attorney's fees and costs; and,

c.  Granting such other and further relief as to the Court seems just and proper.

d.  Convene and empanel a jury.

Dated: White Plains, N.Y.
       April 2, 2007

ANTHONY M. GIORDANO, ESQ.


By: _____
    ANTHONY M. GIORDANO, ESQ. (2735)
    Attorney for Plaintiff
    100 Executive Blvd., Suite 205
    Ossining, New York 10562
    (914) 923 7746

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LAURIE KELLOGG,                                          CIVIL ACTION
                                                         CASE #

                         Plaintiff,

         -against-


NEW YORK STATE DEPARTMENT OF CORRECTIONAL
SERVICES (DOCS); GLENN S. GOURD, Commissioner of DOCS;
LUCIEN LeCLAIRE, Deputy Commissioner for Facility Operations,
FRANK HEADLY, DOCS Deputy Commissioner of Programs
STEVE BERNARDI, DOCS Deputy Commissioner of Policy and Compliance Review
DONNA M. MASTERSON, DOCS Americans with Disabilities Act Coordinator;
LESTER WRIGHT, DOCS Deputy Commissioner and Chief Medical Officer;
ELAINE LORD, former Supt. BEDFORD HLLS CORRECTIONAL FACILITY (BHCF);
ADA PEREZ Superintendent BHCF
TERRENCE MCELROY, BHCF former Deputy of Security;
GWEN.E. SCHNEIDER, BHCF Deputy of Security;
LORI GOLDSTEIN, BHCF Medical Director,
LT. ROBERT BALL BHCF Corrections Officer;
LT. BRANDON SMITH, BHCF Corrections Officer
SGT. CHRISTOPHER MURRAY, BHCF Corrections Officer;
SGT. MARK ARMSTRONG, BHCF Corrections Officer;
SGT. GARY NOTARO, BHCF Corrections Officer;;
C.O. MICHAEL BARCLAY, BHCF Corrections Officer;
C.O. BARRON ROGER BHCF Corrections Officer;
C.O. TRACY DUNCAN, BHCF Corrections Officer;
C.O. BINITA WILLIAMS  BHCF Corrections Officer;
C.O. ALLEN ROBINSON BHCF Corrections Officer;
C.O. ROSLIE JACKSON, BHCF Corrections Officer;
                         Defendants
----------------------------------------------------------------------X
----------------------------------------------------------------------------------------------

                         COMPLAINT
----------------------------------------------------------------------------------------------

                         ANTHONY M. GIORDANO, ESQ.
                         Attorney for the Plaintiff
                         100 Executive Blvd., Suite 205
                         Ossining, New York 10562
                         (914) 923 7746
----------------------------------------------------------------