UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LAURIE KELLOGG,                                            CIVIL ACTION
                                                        CASE # 07 CV 2804 (BJ)(GWG)
               Plaintiff,                                          **AFFIDAVIT**

    -against-


NEW YORK STATE DEPARTMENT OF CORRECTIONAL
SERVICES (DOCS) et al.
                    Defendants
-----------------------------------------------------------x
STATE OF NEW YORK       )
                                 )
COUNTY OF WESTCHESTER  )

    LAURIE KELLOGG, being duly sworn, deposes and says:

1. I am the plaintiff in the matter and am fully familiar with the facts and circumstances.

2. I make this affidavit in opposition to the motion to dismiss.

3. I am a white female and a citizen of the United States. I am currently serving a life sentence in the Women's correctional facility at Bedford Hills, New York for a felony murder conviction in state court despite the fact that I did not personally hurt anyone, much less kill anyone.

4. I am physically disabled. I suffer from multiple disabilities, some of which I entered the facility with but many which developed during my incarceration due to my mistreatment under the care and custody of the Department of Corrections (hereinafter DOCS) and Bedford Hills Correctional Facility (hereinafter BHCF).

5. I am hearing impaired, asthmatic and suffer from TMJ, migraine headaches and stomach ailments. I have an irregular heartbeat and a severe arthritic shoulder condition, a torn rotator cuff injury, for which I have already had one failed surgery and will likely need another. I have a serious elbow injury with nerve damage that requires multiple surgeries and a huge 8 " keloid scar on my elbow.

6. Up until my problems with McELROY, I was not a disciplinary problem. My evaluations were always satisfactory or better. I held a high security job with fire and safety, a position of trust that required me to work throughout the facility. (I lost this position due to defendant McELROY). I completed residential ASAT program where I held a position of peer counsel and support group leader. I am a

member of BHCF family violence program. I taught myself sign during my incarceration and have served as a volunteer interpreter for women n the facility as needed or requested.

7. I am a trained counselor for my unit. I participate in many programs designed to help my fellow inmates. (Exhibit F). I am also a devout Christian. When I am not helping others, I try to keep to myself and avoid the problems involved in prison life. But some things cannot be avoided.

## CONTINUED RETALIATION

8. During my incarceration at BHCF, I have endured overt retaliation for asserting basic rights. I was designated a tracker (despite its not being a recognized designation within DOCS regulations). I have been sexually harassed, sexually assaulted and physically tortured over a period of months when I was deliberately denied pain control medications and pain control instruments for my severe arthritic and painful shoulder. I was subjected to sham disciplinary proceedings brought about by McELROY and a sham appeal process whereby decisions against me were upheld without the recording of the underlying proceeding being sent to or heard by the appeals board.

9. I have been wrongfully kept in solitary confinement, endured harassing cell searches and had legal documents and items of personal property removed, stolen and destroyed from my cell. I have been singled out and subjected to harassing strip searches. When I complained of the violation of procedure by these searches, the searches increased. These acts were usually retaliatory in nature.

10. The bringing of this lawsuit has only resulted in further retaliatory harassment. In April of 2007, shortly after complaints were served within the facility, I had a trailer visit with my handicapped mother. Mom is 61 years old and suffers from debilitating arthritis. She uses a walker or wheelchair, depending on her pain level for that day.

11. On the day of her visit, she used a walker. Despite her obvious handicap, she was harassed by the facility. She was denied use of the handicap accessible golf cart, which is supposed to be available to transport handicapped visitors and, instead, used a facility van that was not handicapped accessible.

12. During her admission process, C.O. Campbell removed 18 eggs she had brought for me from their carton and placed them loose in her clothes bag, closed the bag with a zip lock strip and tossed the bag aside, causing eggs to break on mom's clothes. Mom brought me shampoo. Campbell tore open the packaging so the shampoo could not be returned to the store but then disallowed it coming in. When items are disallowed in, they have to be stored in lockers. Mom had to carry the shampoo to lockers located in the basement area. Naturally, the

basement is not handicapped accessible and mom had to go down stairs without railings while an officer walked behind, yelling at her to hurry.

13. Mom usually refrains from writing to DOCS officials because her experience has been that such complaints results in retaliation against me.  Complaints are minimized due to fear of retaliation.  But even she felt compelled to complain.

14. On the next trailer visit in June, BHCF officials took time from two days set aside for a visit by having the family reunion coordinator question me one day and the sergeant the next day.  Mom got a letter advising that superintendent Perez was investigating.  Naturally, nothing ever came of this so-called investigation.

15. I was ticketed for smuggling, a tier III ticket.  I was accused of smuggling mayonnaise in a lotion jar, a ridiculous but serious charge.  I was kept in prehearing confinement 6 days.  The ticket was eventually dismissed since there was no mayonnaise in the jar.  But I was concerned I was being railroaded again.  During my confinement, mom couldn't get phone calls through.  She was so concerned, she drove from Massachusetts to make sure I was okay.  My mom is not financially secure.  The trip was a hardship for her.  But this is the kind of fear I and my family live with because there is no legitimate entity protecting inmates from abusive officials who retaliate against inmates.  Retaliation has become a fact of life in BHCF, particularly since being labeled as a "tracker" is the equivilent of being labeled a troublemaker, since everyone knows it is a personal designation from Ms. Lord.

### EXHAUSTION OF REMEDIES

16. The claim that I did not file grievances or exhaust available remedies is untrue and disingenuous based upon my record.  I have tried every avenue available to grieve the problems outlined in the complaint.  The fact is that the more serious the allegations being grieved, the higher the barriers to deny inmates their rights.

17. The declaration of Karen Bellamy is an example of the shortcomings of the system set up at BHCF.  The fact that their record reflects a single grievance since 1993 is evidence that a fraud is being attempted upon the court.  I filed a grievance in 2003 relating to the policy to prohibit inmates from wearing female boxer shorts and female pajamas with short bottoms.  Yet it does not show up as part of Ms. Bellamy's record of grievances, which suggests the accuracy of their record keeping.

18. Nor is Ms. Bellamy's claim of what can be "grieved" consistent with DOCS "inmate orientation manual".  (See exhibit C) According to the manual, a grievance is "a complaint about the substance or application of any written or unwritten policy, regulation, procedure, or rule of the facility of the Department, or the lack of a policy of procedure".  In other words, their grievance policy is designed to address particular policy and procedure complaints.  This

"interpretation" has been used to deny me and other inmates from actually filing grievances.

19. A material part of the problem with the BHCF grievance procedure is that the facility uses inmate clerks who are given the authority to determine what can be grieved and what cannot. These inmates serve as gatekeepers to what is grieved and what is not. Inmates seeking to file serious grievances are often "dissuaded" from doing so by these gatekeepers.

20. As pointed out in the complaint, I actively tried to grieve my designation as a tracker since 1994. I was specifically denied that right. I was originally told I could not grieve the designation because it was not a DOCS designation and, thus, not a proper subject of a formal grievance. I was not the only "tracker" denied the right to grieve this designation. Upon information and belief, it was only after another tracker sued the state that she was "permitted" to actually file a grievance on her designation. Incredibly, her grievance was used to deny other trackers, including myself, from grieving this designation since our filing one was considered "unnecessary" as this other grievance would serve to "preserve" my rights on this claim. As shown from the present motion by the state, this was another lie by the facility intended to prevent inmates from preserving the limited rights afforded them under the law.

21. As I was denied a right to file a grievance on my tracker status, I was forced to seek information and help from other areas of DOCS. Thus, I have made inquiries and complaints about my status to Superintendent Lord, Superintendent Perez, DOCS officials in Albany and almost anyone who I thought could provide me information and direction as to how to contest this designation. It is disingenuous for the state to now claim that my complaint is unpreserved when I was denied the opportunity to preserve it. I sent a letter dated October 21, 1998 to the DOCS commissioner and Deputy Commissioner complaining of the designation and my inability to grieve the designation. (See exh. A)  No one responded to that letter saying that I should be grieve the designation.

22. As pointed out in my complaint, on June 15, 2005, a determination was made by C.O.R.C., the decision making body of DOCS, that "Tracker" status was terminated at BHCF. Unfortunately, BHFC officials didn't get that memo. Nothing changed for me at BHCF. I am still called a tracker in log entries and other documents. I am still subjected to the stigma, discrimination and "checking in" system. My pictures are still posted throughout the facility. There are still no regulations advising why or how I was so designated, how long I am to be so designated or how this designation can end.

23. In early 2006, when I continued to be treated and called a tracker, I, again, tried to file a grievance but was, again, refused the right to do so. Thus, for the state to claim that I have not "grieved" this designation is disingenuous.

## SEXUAL HARASSMENT AND MISCONDUCT

24. The claim that I have not grieved the sexual harassment and sexual assault alleged in my complaint is also untrue. Again, it is not considered a grievable offense to the gatekeepers of the grievance office as it does not relate to policy. I made numerous complaints about the sexual harassment to other BHCF officials designated by DOCS to take such complaints. Again, the DOCS inmate orientation book states that incidents of sexual misconduct are to be reported "to any member of our Executive Team or to inmate grievance." As I was prohibited from filing with grievance, (since it is not a policy issue), I reported these incidents directly to the Superintendent, the leader of the Executive Team. I also reported such misconduct to the Inspector General, as permitted in the orientation manual. As pointed out in my complaint, the result of such complaints is further retaliation.

## RETALIATION

25. When I turned down McElroy's sexual advancements, he retaliated against me in many ways. First, he tried to sabotage my then pending civil case in the Court of Claims against the state. When McElroy learned that one of his guards was to be called as a witness in my case, he initiated a bogus investigation against me and the male guard, alleging we had a sexual relationship. The Inspector General's office became involved. The claim was totally false. This poor C.O., whose only role in my case was that he documented in the log a dangerous condition existing a day before I slipped and hurt myself, was harassed until he quit.

26. McElroy is a not a particularly pleasant person. As deputy of security, he was dangerous. Upon information and belief, he was a sexual predator within the facility, engaging in sexually activity with a number of female inmates during his tenure as deputy of security. Some of these women were trackers. His position made it difficult for "trackers" to resist his advances as he had the power to make one's stay tolerable or extremely difficult. I am an example of what happens when you turn him down. The complaint outlines what I was compelled to endure. Putting aside the cell searches, the denial of medication, and all the other items, it is important for the court to know the true purpose of his actions. His bogus disciplinary complaints were intended to have me lose merit time in retaliation. Under DOCS rules, serving 60 days or more in SHU or keeplock makes one ineligible for merit time. McElroy set out to do this and succeeded.

27. The deputy of security, the one supposed to protect inmates and instill discipline, was out to get me. And the CO's all knew it. It was no secret in the facility that I had a severe shoulder injury and was in constant pain. I was (and am) on painkillers literally all the time. This court cannot imagine the terror and torture I experienced during my stay in SHU. SHU is cold and damp, not a place for someone with arthritis and asthma. I was in pain 24 hours a day, 7 days a week for months. The pain in my shoulder can only be described as like having a

    toothache multiplied by 10.  I could not sleep for more than minutes at a time.  If I fell asleep and turned the wrong way, the pain would wake me up.

28. At the time I was placed in SHU, I was in excruciating pain, being denied access to medication which was taken away without my having been examined by any doctor.  I was deprived of asthma medication.  I was denied of all items which that made my pain just tolerable and allowed me to sleep.  My lights were kept on in my cell 24/7.  Any time I was moved, I was in torture.  When I was moved, I was shackled with the heavy metal shackles despite my known medical condition and medical modified restraint orders.  The heavy shackles would weigh on my shoulder and cause my shoulder to ache even worse.  All these things led to my further injuring myself.

29. On or about April 21, 2004, I was placed in full box shackle restraint and compelled to carry my own legal file to an internal hearing arranged by McELROY in order to continue me in SHU on a "contraband" charge.  During this move, I tripped and fell on broken pavement on the path.  Had I not been improperly shackled (in violation of the medical modified restraint order) and not been compelled to carry my own file (contrary to procedures), I likely would not have been hurt at all.  But I could not brace myself and suffered a broken finger.  But the real injury was caused by the guard escorting me.  Rather than help me up gently, the C.O. grabbed my bad arm and pulled me up hard, causing something in my shoulder to rip and causing my elbow to partially dislocate.

30. Despite my obvious pain, the officials delayed getting me medical assistance.  What the court must understand is that the word was out from McElroy.  I was to be punished. It was McElroy who ordered me shackled against the medical modified restraint order.  It was McElroy who wanted me treated harshly to punish me, resulting in my being injured by the brutal actions of the guard.

31. Further, as to Dr. Goldstein, I point out that I would never have been denied my medication for so long without her knowledge.  She has made decisions about my medical condition not because of any medical diagnosis but for reasons other than my condition.  A treating physician recommends an MRI and she denies it.  Upon information and belief, she doesn't deny it because of a difference of opinion but to save the state money.  She knowingly allowed my meds to be kept from me while I was in SHU knowing that I was in severe pain all the time.  Her neglect is clear.  I would ask the court to deny the motion to dismiss in this case.

Sworn to this 4th  
day of October 2007                    _____/s/_____  
                                                    LAURIE KELLOGG

_____/S/_____  
   NOTARY PUBLIC