UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
LAURIE KELLOGG,                                    CIVIL ACTION
                                                   CASE # 07 CV 2804 (BJ)(GWG)
                          Plaintiff,

        -against-


NEW YORK STATE DEPARTMENT OF CORRECTIONAL
SERVICES (DOCS) et al.
                          Defendants
---------------------------------------------------------x




PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS




                          Anthony M Giordano, Esq. AMG(2735)
                          Attorney for the plaintiff
                          100 Executive Blvd., Ste 205
                          Ossining, New York 10562
                              (914) 923 7746

Table of Contents

Page

TABLE OF AUTHORITIES…………………………………………..3

STATEMENT ON THE CASE…………………………………………4

ARGUMENT………………………………………………………………9

STANDARD OF REVIEW FOR A 12(b) MOTION TO DISMISS……….9

POINT I-PLAINTIFF'S CLAIMS AGAINST DOCS AND THE
SUPERVISORY DEFENDANTS IN THEIR OFFICIAL CAPACITY……9

POINT II-PENDENT STATE LAW CLAIMS……………………………...9

POINT III-STATUTE OF LIMITIATION PRIOR TO APRIL 6, 2004……10

POINT IV-PLAINTIFF EXHAUSTED HER REMEDIES THROUGH
AVAILABLE CHANNELS …………………………………………..11

POINT V- PLAINTIFF STATES A DUE PROCESS CLAIM
RELATING TO DEPRIVATION OF HER PROPERTY………………….16.

POINT VI-PLAINTIFF HAS PROPERLY ASSERTED
AN EQUAL PROTECTION CLAIM………………………………………17

POINT VII-PLAINTIFF'S TRACKER DESIGNATION IS A
CONSTITUTIONAL VIOLATION………………………………………..18

POINT VIII-PLAINTIFF HAS ADEQUATELY PLEADED CONSPIRACY..19

POINT IX-PLAINTIFF HAS ALLEGED PERSONAL INVOLVEMENT
OF DEFENDANTS……………………………………………………19

POINT X-PLAINTIFF'S CLAIM OF DELIBERATE INDIFFERENCE
IS SUFFICIENTLY PLED FOR PURPOSES OF A RULE 12 MOTION..21

TABLE OF AUTHORITIES

CASE                                                                                    PAGE

*Bell Atlantic Corp v Twombly*, 127 S. Ct. 1955, 1964, (2007) …………………………………8

*Iqbal v Hasty*, 490 F.3rd 143, 157-158……………………………………………………………… .9

*ATSI Commc'ns, Inc., v Shaar Fund, Ltd*, 493 F.3d 87, 98 (2d Cir. 2007). …………………9

Cosmas v Hassett, 866 F.2d 8, 13(2d Cir. 1989) ……………………………………………………9

Jones v. Bock, 127 S.Ct. 910, at 922 (2007)…………………………………………………10, 11, 12

*Porter,* 534 U.S. at 524, 122 S.Ct. 983……………………………………………………………14 .

*Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).  …………………………………………………14

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) ……………………………………………14

 *Marvin v. Goord*, 255 F.3d 40, 43 n.3 (2d Cir. 2001) …………………………………………14

Gibson v. Brooks, --- F.Supp.2d ----, 2004 WL 2095610 at *1 (D.Conn., Sept. 16, 2004)…14

*Jenkins v. Haubert,* 179 F.3d 19 (2d Cir. 1999) ………………….……………………………14, 15

*Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006)…………………………………………16

*Warren v. District of Columbia,* 353 F.3d 36, 37 (D.C.Cir.2004)……………………………17

 *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)………17

*Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996).  …………………………………..19

*Romer v Morgenthau*, 119 F.Supp.2d 346, (SDNY, 2000) …………………………………20

*Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986)…………………………………………20

*Superintendent, Mass. Correc'l Inst. v. Hill,* 472 U.S. 445, 105 S.Ct. 2768,  (1985)……….21.

STATEMENT ON THE CASE

Plaintiff LAURIE KELLOGG, was born 8/16/64.  She is a white Christian, physically

disabled and was, at all relevant times, an inmate in the care and custody of defendant DOCS

at Bedford Hills Correctional Facility (BHCF) since September 18, 1992.

Plaintiff's complaint alleges wrongful retaliation against her for exercising and/or

attempting to exercise and enforce certain rights afforded by law. (See complaint par 31)  She

also alleges wrongful retaliation against her for refusing to engage in illegal and illicit sexual

demands made by facility officials and their friends (Id, Para 36), for reporting sexual abuse

to authorities and for exercising other of her rights afforded under the U.S. and New York

State constitutions.  Plaintiff alleges that this retaliation took many forms over her time

within BHCF..

In 1996, four (4) years after Plaintiff entered BHCF, it took the form of an unofficial and

illegal designation of "tracker".  This designation was bestowed by defendant LORD

purportedly in retaliation for plaintiff refusing to engage in an illegal sexual relations with

someone within LORD'S inner circle. (Id, ¶ 37-39).  The designation of tracker has no

known penological purpose, does not exist within any known Department of Correctional

Services (hereinafter DOCS) rules or guidelines or officially within BHCF.  There are no

DOCS or BHCF directives, standard operating procedures (SOPS), memos or internal

regulations defining the designation of "tracker".  There are no official writings providing

standards or protocols in designating an inmate a tracker or in how an inmate so designated

sheds this designation.  (Id, ¶ 37-41)

The tracker designation causes significant limitation or curtailment of the limited rights
afforded an inmate within BHCF without due process and draws significant but unwanted,
unwarranted and unfavorable attention from other inmates and BHCF staff.  The designation
causes Trackers to be more susceptible to verbal, physical and sexual abuse and harassment
within BHCF from guards and/or other inmates.  Trackers are more susceptible to being
subjected to arbitrary, capricious and punitive rules that can vary from shift to shift and from
guard to guard since there are no written rules, regulations or protocols for it.  The "tracker"
designation deprives those so designated, including plaintiff, and/or curtails them of rights
and privileges afforded other inmates without reason.  Due process and/or grievance rights
are not afforded to those so designated (Id, ¶ 42-45)

In Plaintiff's case, her "tracker" status has caused her unwarranted notoriety and stigma
within BHCF.  It is a source of ridicule and embarrassment within BHCF as her designation
is routinely emblazed in large red "tracker" marker on bulletin boards next to her name
during trailer visits.  Her photograph was and continues to be posted at every watch station.
Her housing location was and continues to be hi-lighted in red on BHCF consoles.  Her
photograph was and continues to be kept in every area logbook and posted on the walls at the
front gate and in other areas.  (Id, ¶ 45)

Plaintiff's movements are tracked within BHCF.  Her movements are required to be
logged at each watch station and must be reported to the guard tower.  During "Code Blue"
drills, plaintiff's "tracker" designation requires BHCF guards to enter her unit, demand her
cell number from posted guards, open her cell door and demand her identification, DIN
number and date of birth.  Once this "identification process" is completed and verified, her

cell door is relocked.  Her tracker designation exposes Plaintiff to harsher punishments for

what would otherwise be minor offenses for other inmates not so designated.  (Id, ¶ 46-7)

Despite multiple efforts over a number of years, (See ex. A), plaintiff has been repeatedly

denied a hearing on this designation.  Her efforts have been ignored, disregarded or have

resulted in further retaliatory actions taken against her. (Id, ¶ 50-53)

On or about June 15, 2005, C.O.R.C., the decision making body of DOCS, rendered an

opinion advising that "tracker" status was no longer to exist at BHCF.  Unfortunately, this

was a decision without impact since nothing changed for Plaintiff within BHCF.  She is still

referred to as a "tracker" in log entries and other official documents.  She is still subjected to

the stigma and discriminatory "checking in" system mentioned above.  Her pictures are still

posted throughout the facility.  In effect, BHCF has ignored DOCS decision.  Plaintiff's

ability to contest her status did not change.  As recently as early 2006, Plaintiff again tried to

"grieve" her tracker status but was, again, refused the right to do so.  (Id, ¶ 58-5)

Defendant McELROY targeted Plaintiff for retaliation for refusing his sexual solicitation.

Upon information and belief, facility administrators knew or had reason to know from other

complaints that McELROY was sexually active with inmates, including other trackers,

within BHCF.  Upon information and belief, facility administrators knew or had reason to

believe McELROY would retaliate against inmates who declined his solicitations.  He did so

against plaintiff in many ways, including trying to sabotage a then-pending civil action

brought by plaintiff against the state by harassing a notice witness and initiating a bogus

criminal "investigation" against this witness for, ironically, alleged illegal sexual relations

with plaintiff.  He actions caused state investigators to question plaintiff on her "relationship"

with this witness and his intended role in her upcoming trial against the state, (Id, ¶ 62-64).

He ordered harassing cell searches and harassing charges against her, depriving plaintiff of needed pain medication and utilities.  He tried to incite inmate violence against plaintiff, hindered her access to legal counsel and committed perjury at a hearing during her trial when he denied plaintiff was a "tracker" (Id, ¶ 64-78).

Plaintiff also alleged that McELROY retaliated against her for her making a complaint of sexual abuse against his friend, defendant ROBINSON, that resulted in his bringing more harassing searches, manipulating to have plaintiff segregated to SHU (special housing unit) for "contraband" prior to any search being conducted and knowing that items seized were lawfully possessed by plaintiff.  He also had plaintiff's legal papers and items of personal property stolen, removed and/or destroyed in retaliation.  (Id, ¶ 79-82).

After getting her into SHU, McELROY deliberately deprived plaintiff of needed pain medication and utilities specifically to cause her daily, extensive suffering, without any medical review of her condition and, upon information and belief, with the knowledge and consent of defendant GOLDSTEIN, BHCF's medical chief.  (Id, ¶ 83-88).

Upon information and belief, McELROY ordered unwarranted searches and had fabricated charges filed against Plaintiff to ensure that plaintiff was labeled a "high profile inmate" in order to isolate her in SHU and harm plaintiff's prison record.  (Id, ¶ 89-39)

Upon information and belief, McELROY ordered guards to deliberately mistreat plaintiff by having them disregard her physical complaints of pain and discomfort, by having them ignore usual and customary practices within BHCF such as complying with medical orders for modified restraints and/or failing to assist a fully shackled plaintiff carrying her file to a hearing.  Thus, on or about April 21, 2004, in full box shackle restraint that ignored the modified restraint medical order and by compelling plaintiff to carry her own legal file to an

internal hearing arranged by McELROY to keep plaintiff in SHU, plaintiff fell on broken pavement. The escorting guard then viciously yanked Plaintiff by her damaged arm and shoulder, causing her to re-injure her shoulder and to suffer additional injuries. (Id, ¶ 91)

Plaintiff suffered long-term injury to her elbow but has been denied a second opinion for her elbow injury despite obvious poor results and disastrous scarring from the facility's alleged hand specialist. Plaintiff continues to experience numbness and pain in both hands resulting from her brutal treatment at the hands of the guards at the direction of McElroy. Plaintiff continues to be denied proper medical care and has suffered material medical neglect. (Id, ¶ 91-93)

Plaintiff was denied due process at her administrative segregation hearing (Id, ¶ 96-99). She has been subjected to and complained of sexual harassment, complaints that have been wholly ignored. She was compelled to submit to being photographed in various stages of undress and guards were permitted to distribute these photos throughout the facility. Requests for the return and destruction of these photos have been ignored. She has been compelled to undergo prurient strip searches by a known lesbian guard. Complaints made by her were reported to the guard, resulting in further harassing searches as well as other harassing conduct against plaintiff relating to plaintiff's ability to bring her medication in the visiting room. (Id, ¶ 101-108) Plaintiff has been subjected to discrimination due to her medical condition in being denied entry into programs and by policies implemented prohibiting inmates with medical restrictions from being assisted. (Id, ¶ 112-114)

ARGUMENT

STANDARD OF REVIEW FOR A 12(b) MOTION TO DISMISS

In *Bell Atlantic Corp v Twombly*, 127 S. Ct. 1955, 1964, (2007), the Supreme Court reconsidered the standard for deciding a defendant's motion to dismiss, and applied a "flexible 'plausibility standard' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*". *Iqbal v Hasty*, 490 F.3rd 143, 157-158. (emphasis in the original).  While *Twombly* did not make clear whether this change from traditional pleading standards applies outside the antitrust context, the Second Circuit has "declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases".  *ATSI Commc'ns, Inc., v Shaar Fund, Ltd*, 493 F.3d 87, 98 (2d Cir. 2007). Nevertheless, courts must continue to accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI*, 493 F.3 at 98.

A court must also limit itself to "consideration of the facts alleged on the face of the complaint , and to any documents attached as exhibits or incorporated by reference." Cosmas v Hassett, 866 F.2d 8, 13(2d Cir. 1989).

POINT I-PLAINTIFF'S CLAIMS AGAINST DOCS AND THE SUPERVISORY DEFENDANTS IN THEIR OFFICIAL CAPACITY

Plaintiff concedes the position of the state and withdraws the claims against defendants DOCS, FISHER, LeCLAIRE, RAYMOND and WRIGHT.

POINT II-PENDENT STATE LAW CLAIMS

Plaintiff concedes the position of the state and withdraws Plaintiff's state claims

<u>POINT III-STATUTE OF LIMITIATION PRIOR TO APRIL 6, 2004</u>

It is conceded that certain events occurred prior to April 6, 2004 and cannot serve as a basis for damages but dismissal of certain causes of actions against defendants DOCS, GOORD, LORD, MCELROY, ROGER and BARCLAY is premature.  Although certain acts attributed to these defendants occurred prior to April 6, 2004, other acts plainly occurred after that date or involve unknown dates.  Some acts constitute a continuing course of retaliatory conduct stemming from an initial act occurring earlier than April 6.  Dismissal of causes of action should be held in abeyance until disclosure is completed so that plaintiff can discern the full extent of the retaliatory conduct committed against her and the specific dates of their occurrence.

For example, it is alleged that defendant McELROY'S retaliatory conduct commenced from an incident occurring in 2002 when plaintiff refused his sexual advances.  But much of his retaliatory conduct against her that caused her injury occurred after April 6, 2004, and up to at least August of 2004.

A further example is plaintiff's tracker status.  Although implemented in 1997, Plaintiff continuously protested her tracker status through numerous correspondences to Defendants LORD and GOORD, and sought reasons and/or authority for it, to no avail.  Her complaints regarding her status were all but ignored.  GOORD declined to take steps to address plaintiff's complaints or to address the situation with LORD, despite his position with DOCS and knowing or having reason to know there was no grievance review or appeal for this status in place. Plaintiff's tracker status continued well past April 6, 2004 and continues to the present day, despite a ruling from CORC that the status no longer exists at BHCF.

<u>POINT IV- PLAINTIFF EXHAUSTED REMEDIES THROUGH AVAILABLE CHANNELS</u>

It is respectfully submitted that the state's motion to dismiss based upon the claim that plaintiff failed to exhaust her remedies is premature and disingenuous.  First, the Supreme Court has held that failure to exhaust is an affirmative defense and inmates are not required to specially plead or demonstrate exhaustion in their complaints.  See *Jones v. Bock*, 127 S.Ct. 910, at 922 (2007).

 The court also held that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." (Id, at 923).

The court specifically rejected an interpretation of PLRA Section 1997e(a) that dismissal of the entire complaint is necessary if a single claim failed to meet the pertinent standard of exhaustion.  Id at 924

In this case, the defense seeks dismissal based on an exhaustion of remedies defense despite knowing or having reason to know that the specific grievance procedures available at BHCF are very limited and corrupted.  The BHCF grievance procedures appear designed to minimize, if not outright frustrate, the number and type of inmate grievances.  The declaration of Ms. Bellamy constitutes proof of the limitations of the process since plaintiff has filed more than one grievance in her years at BHCF and they are not listed with Ms. Bellamy. (See Kellogg affidavit)

It is pointed out that Ms. Bellamy's claim of a purported wide range of grievances permitted by the BHCF grievance process is inaccurate at best, and inconsistent with DOCS "inmate orientation manual".  Their orientation manual spells out specifically what complaints can be grieved.  (See Exhibit C, pg 5).  DOCS manual specifically limits inmate grievances to complaints "about the substance or application of any written or unwritten policy, regulation,

procedure, or rule of the facility of the Department, or the lack of a policy of procedure". Thus,

DOCS grievance policy is specifically limited to policy and procedure complaints, a fact

consistent with plaintiff's complaints that she was denied her right to file a grievance on her

tracker status as that status is not a DOCS designation. Further, the manual specifically excludes

from the grievance process all "disciplinary decisions, TAC decisions, Family Reunion

decisions, inmate property claims results, FOIL requests, TRC decisions, media review, OMH

and CMC decisions".

   As put forward in the complaint, these limitation as to what constitutes a proper subject of a

grievance has been used to deny inmates in general and plaintiff in particular from filing

meritorious grievances. BHCF uses inmate clerks who are given authority to deny inmates the

right to file a grievance if the believe such a grievance does not comport to BHCF's opinion as to

what is a proper subject of a grievance. It is alleged in the complaint that these "gatekeepers" of

inmate complaints at BHCF often deny inmates legitimate grievances against facility officials or

personnel by denying them forms and/or by advising that the intended grievance is not

"grievable", i.e., not involving a policy of the facility. They have also been known to suggest or

warn of the possibility of retaliation for certain types of grievances if filed.

   Plaintiff's claims were properly advanced through appropriate forums available at BHCF,

which is all that is required under *Jones*, supra. For example, as pointed out in her complaint,

plaintiff made numerous efforts from 1996 to the present to file a grievance within BHCF

regarding her tracker designation but was refused the right to do so by these gatekeepers. Thus,

contrary to the claim in the state's motion, the assertion that plaintiff "chose" not to grieve her

status, (State memo at pg 18) in inaccurate as she was denied the right to do so by agents of the

facility enforcing BHCF policy that "her [Tracker] status was not a proper" subject of a

grievance". Since she could not file a grievance on her status, she was compelled to use other means available to her to complain of it. This included letters to DOCS, (GOORD) and the BHFC superintendent. (Complaint, ¶ 51-59, see also Exhibit A).

The state's claim that plaintiff did "nothing for fourteen years and then files a complaint" (State memo of law at pg 17) is contrary to the facts and grossly mischaracterizes the actions taken. Despite multiple complaints to those purportedly in authority and responsible for such matters, nothing was done. It is pointed out that the tracker designation is contrary to DOCS procedure. According to DOCS policy, classification designation of an inmate is to be determined by a counselor, who makes such a determination after reviewing facility documents such as a pre-sentence report, rap sheet and/or other documents. (Exhibit D) This designation can be appealed by an inmate to a senior counselor. Nothing in the written procedures of DOCS permits a designation to be made by a superintendent without grievance or appellate rights.

Plaintiff exhausted her remedies through remedies available to her at BHCF. She made complaints of official misconduct through official channels available.

It is submitted that "while the PLRA's exhaustion requirement is 'mandatory,' *Porter,* 534 U.S. at 524, 122 S.Ct. 983 ..,certain caveats apply." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). These caveats fall into three categories: when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement. *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) *Marvin v. Goord*, 255 F.3d 40, 43 n.3 (2d Cir. 2001); *see* Gibson v. Brooks, --- F.Supp.2d ----, 2004 WL 2095610 at *1 (D.Conn., Sept. 16, 2004) (holding oral complaint resulting in apology

was sufficient to defeat summary judgment on informal exhaustion theory). Moreover, if a different remedy is prescribed by the prison system, that will constitute an exhaustion. See *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999) (noting exhaustion through a disciplinary appeal) The "court must ask whether administrative remedies were *in fact* 'available' to the prisoner." *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (emphasis supplied).

In plaintiff's case, it is clear that administrative remedies for her complaints were not available through grievance procedures. Her complaints of retaliation, deprivation of property, sexual abuse, sexual harassment, cruel and unusual punishment, due process, equal protection, conspiracy and deliberate indifference to medical needs, were properly made through other means and to appropriate persons or administrative officials responsible for such complaints within BHCF. For example, plaintiff complained of sexual harassment from defendant DUNCAN directly to defendant PEREZ, a member of the BHCF Executive Team. BHCF rules state that sexual harassment complaints can be reported to "any member of our Executive Team or to Inmate Grievance". (Emphasis added) (See Exhibit C). BHCF provides two methods for complaints for such harassment. Presumably, due to the nature of the complaint being grieved, this is done to insure sufficient privacy for the inmate and to induce sexually harassed inmates to report it to someone in authority rather than risk retaliation from a public grievance procedure.

As stated in her complaint, plaintiff reported DUNCAN'S sexual harassment to PEREZ. PEREZ acknowledged the complaint and promised plaintiff it would stop. PEREZ disclosed her complaint to defendant DUNCAN and DUNCAN engaged in further retaliation against plaintiff. Further, complaints of sexual harassment were also made to the inspector general's office, another option available under their guidelines. Upon information and belief, that complaint resulted in plaintiff's second stay in SHU.

Plaintiff's complaints of retaliation by McELROY are recorded throughout her disciplinary proceedings, confinement in SHU and appeal process. In her appeal papers, she specifically states she was "targeted to further harass me on behalf of DSS T. McElroy", that her "persecution" was "a direct result of DSS McElroy's personal vendetta against me". She complained of medication being improperly taken from her, of her almost dying from an asthma attack in SHU, and her complaint that McElroy improperly influenced the hearing officer. See Exhibit E. Her appeal was denied. Her remedy was exhausted.

Plaintiff's complaint of improper retaliation from defendant McELROY was properly preserved and exhausted in the grievance procedure available to her, the disciplinary hearing. She reported the actions taken against her were directed by McELROY and involved provably false allegations. She reported that the proof of her harassment could be found right from the log records which showed that her cell was searched and no contraband found shortly before she was removed from her cell, put in SHU confinement and another search conducted during which contraband was found. She complained that McElroy wanted her in SHU and the second search was intended to substantiate his retaliatory actions. Her retaliatory complaints against McELROY were properly reported and exhausted. See *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999) (noting exhaustion through a disciplinary appeal).

Complaints of her property being damaged, taken or destroyed and legal papers being removed were made to the proper and known channels available to her. As shown, the manual specifies that this type of complaint is not the proper subject of an inmate grievance. But a complaint was made. No action was taken.

Plaintiff's medical mistreatment in SHU was reported to numerous authorities within BHCF, including medical personnel, letters to the superintendent and in disciplinary hearings, as pointed

out above.   Complaints of retaliatory, harassing cell searches are documented in these hearings

documents and records, as well as in appeal papers.

It is pointed out that plaintiff has had legal and other papers removed from her cell during

these retaliatory searches and the result is that she has only limited documents to support her

claims of preservation through those channels made available to her.  Clearly, the state should

not benefit from their own misconduct at this early stage of the litigation.

Disclosure is required since there are obvious factual differences involving the "grievance"

system available to inmates at BHCF.  Disclosure is required to determine what policies exist

relating to complaints made by plaintiff and what appeals process existed.

POINT V.  PLAINTIFF STATES A DUE PROCESS CLAIM RELATING TO DEPRIVATION
OF HER PROPERTY.

It is respectfully submitted that, again, this application is premature.  The plaintiff is not in

possession, at this time, of the documents necessary to make out her claim.  Such documents are

in the exclusive possession of the defendant BHCF.  Plaintiff has exhausted her remedies and her

allegations that wrongful destruction of personal property included the removal, theft and

destruction of legal documents and papers plainly include constitutional issues.  See *Brownell v.

Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing prison officials' erroneous advice that the

plaintiff's lost property was not the responsibility of the prison he had been transferred to, which

resulted in a failure to investigate; a prison official's advice to abandon his property claim and

pursue a grievance instead, resulting in loss of the ability to appeal the property claim; and the

lack of any apparent provision in the grievance system for raising newly discovered facts in a

previously filed grievance);


POINT VI-PLAINTIFF HAS PROPERLY ASSERTED AN EQUAL PROTECTION CLAIM

It is submitted that complaints must be read liberally; dismissal on the pleadings *never* is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory. *See Warren v. District of Columbia,* 353 F.3d 36, 37 (D.C.Cir.2004); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In this case, plaintiff's allegations constitute an equal protection claim. Plaintiff has alleged that she is a white woman targeted and subjected to disparate treatment by black officials due to her color and/or her religion and/or her refusal to engage in sexual activities with the officials or their associates. The defense that plaintiff has not shown that "the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that [s]he must demonstrate [her] treatment was not reasonably related to [any] legitimate penological interests" is a premature. Disclosure is required to assess whether any "legitimate penological interests" was served, as suggested by the defense, by a "tracker" designation that has no written rules, protocols or procedures.

It would seem that the burden of proof to establish the "legitimate penological interest" served by "tracker status" should be on the defense since it is a designation that is contrary to DOCS procedures that allows a single official to punitively designate inmates without any set standards for such designation, without grievance procedures to contest such designation and without appellate review for such designation. Plainly, no legitimate penological interest is served when this arbitrary designation can cause enhanced punishments. It is an issue of proof and not an issue for a Rule 12 motion to dismiss. ,

With arbitrary rules existing for "trackers" (since there are no rules) and as trackers are susceptible to greater punishment, limited as to job positions and suffer other discriminatory

practices without due process for their designation, it cannot serve any legitimate security

purpose.

### POINT VII-PLAINTIFF'S TRACKER DESIGNATION IS A CONSTITUTIONAL VIOLATION

As pointed out above, plaintiff's "tracker" designation is <u>not</u> a DOCS designation.  It is

not an outwardly acknowledged BHCF security designation.  It has no rules, protocols or

standards for this designation.  Further, the fact CORC has held that the designation no longer

exists at BHCF is revealing since it has never formally existed, in terms of being a recognized

policy of DOCS.  Thus CORC's decision states what has been DOCS position on trackers all

along.  It doesn't exist.  But, in practice, it does.  And, as stated in the complaint, plaintiff was, is

and continues to be subjected to disparate treatment due to this designation. (Id, ¶49).  She was

and is subjected to longer SHU confinements for what are, for others, minor infractions.  Further,

plaintiff specifically asserts that the rules and punishment for trackers are wholly arbitrary with

trackers being subjected to greater punishment solely due to this designation, plainly a liberty

interest.  Plaintiff has been discriminated on the type of work positions she can have within the

facility and other discriminatory policies without due process due to this designation.

Again, the defense confuses a motion for summary judgment with a motion to dismiss by

seeking dismissal on the failure of "a prisoner" to "present evidence inferring that the

Defendant's acted with an improper motive."  Without disclosure, this is not the proper standard

for a Rule 12 dismissal.  The motion on this issue must be denied.

### POINT VIII-PLAINTIFF HAS ADEQUATELY PLEAD CONSPIRACY

It is submitted that plaintiff alleges sufficient facts to allege a conspiracy to deprive plaintiff of a constitutional right by the named individuals in (Id, ¶133-35). For example, in the body of the complaint, Plaintiff alleged that defendant McELROY, in complicity with "defendant GOLDSTEIN" conspired to deprive plaintiff of needed pain relief medication without benefit of any change in her medical condition or review of her medical condition by the medical staff. She was deliberately deprived of pain medication by McELROY and GOLDSTEIN solely to cause her pain 24 hours a day, seven days a week without relief, in violation of her Eighth Amendment rights. (Complaint at ¶84-86). Plaintiff further alleged that McELROY, the deputy of security, had guards deliberately mistreat plaintiff, to ignore medical restriction orders and humane and in effect protocol to assist a fully shackled inmate being moved. (Complaint @ ¶90-93). The complaint is not "conclusory, vague, or general" but contains specific and provable allegations of facts. The Rule 12 motion must be denied.

POINT IX-PLAINTIFF HAS ALLEGED PERSONAL INVOLVEMENT OF DEFENDANTS

A. Defendants BALL and ARMSTRONG

Contrary to the defense claim, the allegations against BALL and ARMSTRONG are not that they took pictures of an injury. It is that they deliberately took photos of plaintiff despite the fact she suffered no photographable injuries, in order to obtain photos of her in semi-nude stages of undress solely for their own prurient interests and as a way to sexually harass plaintiff by then distributing these pictures throughout BHCF. (Complaint @ ¶90-93). These individuals then had plaintiff drug tested and confined for three days, again, without her pain medication. Sex-based discrimination, including sexual harassment, is be actionable under Section 1983. See *Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996).

B. Defendant PEREZ

Contrary to the defense claim, the allegations against PEREZ are not that she ignored a complaint or failed to undertake an investigation. The complaint is that BHCF officials, including PEREZ, knew DUNCAN was a lesbian, knew she had a sexual preference for young, white inmates but, despite this knowledge, allowed DUNCAN to unilaterally decide who to strip search. That when Plaintiff complained to PEREZ, she accepted her complaint and advised that the strip searches would end. Instead, PEREZ deliberately informed DUNCAN of plaintiff's complaint, failed to stop the searches as promised and plaintiff was forced to endure further retaliatory sexual harassment while PEREZ did nothing. (Complaint @ ¶104-108). It is submitted that direct participation is not needed if a defendant "learned of [a] wrong and failed to correct it." *Romer v Morgenthau*, 119 F.Supp.2d 346, (SDNY, 2000) citing *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Moreover, it is unknown at this stage whether it was Perez' intent to allow DUNCAN to harass plaintiff to silence her complaints. The complaint sufficient alleges personal involvement of PEREZ.

### C.  Defendant SCHNEIDER

Plaintiff has alleged a clear first amendment violation as SCHNEIDER'S threat was to impose punishment for plaintiff exercising her right to petition a government official. This was not verbal harassment or a threat to violence for some unknown reason. This was a threat to impose punishment should plaintiff exercise her rights. (Complaint @ ¶90-93). Her injury was to refrain from making further complaints to defendant PEREZ on threat of being placed in SHU.

### D.  Defendants SMITH and NOTARO

It is submitted that the gist of the claim against defendants Smith and Notaro is not merely that they filed a false report but that they also acted to deny plaintiff due process of law as they gave knowingly false testimony under oath. Furthermore, it was alleged that McELROY

submitted "evidence" consisting of a "secret" tape recording purportedly containing "reliable" information from four "witnesses" who purportedly provided "specific and detailed information" relating to undisclosed violations allegedly committed by Plaintiff. The specific violations allegedly contained on this tape were withheld from Plaintiff. Plaintiff was refused information on these secret violations and denied the opportunity or ability to refute the allegations or confront those alleged to have made them.

It is conceded that no 1983 action lies for false charges by prison guards so long as plaintiff is afforded due process on those charges. In this case, plaintiff contends that this was not the case as prison officials relied on a "secret tape" whose contents were not revealed, as well as perjured testimony of the persons who brought the allegations. Whether the hearings satisfied due process is an issue of fact and requires further disclosure and a denial of the defense motion at this time. See *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985).

### POINT X-PLAINTIFF'S CLAIM OF DELIBERATE INDIFFERENCE IS SUFFICIENTLY PLED FOR PURPOSES OF A RULE 12 MOTION.

It is submitted, once again, the defense erroneously equates proof at trial with allegations contained in the complaint for purposes of a Rule 12 motion. Plaintiff has sufficiently pleaded that she suffers from multiple disabilities, that she is "hearing impaired, asthmatic and suffers from TMJ, migraine headaches and stomach ailments. She has an irregular heartbeat and a severe arthritis shoulder condition (the result of a torn rotator cuff injury for which she has already had one failed surgery and will likely need another) and an elbow injury for which she was caused to suffer nerve damage and has had multiple surgeries). She has been medically

prohibited by DOCS medical staff from engaging in physical activities such as "pushing, pulling or lifting" and similar activities. (Complaint at ¶6). (See Exhibit B)

She has alleged that "McELROY knew of her medical condition", and took specific action to punish Plaintiff and ensure she would suffer "extreme discomfort in SHU for an extended period of time" (Complaint at ¶84) by having "intentionally denied and/or had withheld" all "medically prescribed pain medication and pain reducing equipment, actions that required knowledge and consent of defendant GOLDSTEIN" (Complaint at ¶86).  It was alleged that this "intentional withholding of pain medication and instruments from plaintiff was done without medical cause, as plaintiff continued to experience intense pain from her shoulder and other injuries.  Along with her medication, plaintiff was denied ice for her shoulder, batteries for her medically prescribed TENNS unit, her medically authorized second mattress to assist her in sleeping on her painful shoulder and second pillow.  The result was that plaintiff rarely slept continuously for more than minutes at a time, her sleep being frequently interrupted by sharp, aching pain from her arthritic shoulder whenever she moved.   Plaintiff was denied pain medication for months while in SHU." (Complaint at ¶86)

Plaintiff also alleged that she while in SHU, she was "deliberately denied her asthma pump, an act of deliberate neglect that almost resulted in serious injury, if not death, when, in early May 2004, she suffered a severe asthma attack while in SHU but was unable to alert the guards due to her inability to breath.  Plaintiff avoided serious injury when other inmates who heard plaintiff desperately banging her cell walls in distress eventually alerted guards.  She was rushed to a hospital facility and treated.  Incredibly, she was returned to the same SHU cell, again, without her asthma pump and suffered a second asthma attack four hours after returning." (Complaint at ¶87)

Plaintiff has also alleged that McELROY had guards disregard medical orders made to lessen plaintiff's suffering as well as other protocols designed to avoid harm to inmates. For example, she alleged that McELROY made sure guards ignored a medically ordered modified restraint order and used a heavy box shackle deliberately to ensure that she suffered pain in her shoulder. She also alleged that McELROY made it known that Plaintiff "would be in excessive and intolerably severe pain for literally hours, further causing her to be deprived of sleep and comfort". (Complaint at ¶90). She further alleged that McELROY deliberately had her guards ignore the usual protocol designed to assist shackled inmates in moving by assisting them in carrying files etc. Plaintiff was caused to fall, could not protect herself due to the shackles and her being forced to carry her files and then was brutally forced up, causing her further injury. (Complaint at ¶90-91).

Plaintiff further alleged that despite the fact that "BHCF Physicians have recommended a plastic surgeon and neurologist examine plaintiff" for the injuries suffered during this incident, defendant GOLDSTEIN "has ignored such recommendations. Plaintiff's requests for a second opinion for her elbow have also been denied despite the obvious poor results and disastrous scarring from the facilities hand specialist. Plaintiff continues to experience numbness and pain in both hands." And although "medically recommended that a ct scan and/or MRI be taken of plaintiff's ankle, GOLDSTEIN and BHCF medical department has refused to act on these recommendations."

Although the defense suggests that the pleadings, as relating to defendant GOLDSTEIN, are deficient in failing to allege that GOLDSTEIN "knowingly and intentionally rendered improper treatment or knew of and disregarded a substantial risk of serious harm to the plaintiff", that claim is unsupported by the actual pleadings. The deliberate refusal to seek tests

recommended by BHCF physicians, knowingly and deliberately permitting the withdrawal of necessary pain medication and pain reduction instruments over an extensive period of time without any change or improvement in plaintiff's medical condition, (and in fact a worsening of her condition due to the abuse suffered in SHU), that she was denied her asthma pump even after suffering a severe asthmatic attack, certainly make out a cause of action for deliberate indifference.  Furthermore, the allegations involving the failure to bring in a specialist or have a ct scan was not a "mere disagreement in treatment".  This was the recommendation of BHCF own doctors based on their evaluation of the plaintiff.  Goldstein overrode their recommendation for, upon information and belief, non-medical reasons.

The above facts plainly assert that plaintiff suffered severe and painful disabilities for which BHCF had already diagnosed and prescribed treatment.  Despite that fact, plaintiff was placed in SHU and deliberately denied all forms of pain medication and other treatment she had been already receiving without any change in her medical status and without any new medical evaluation for an extensive period of time  As the defense does not contest the serious medical condition (Defendant's memo at page 30).  The indifference to plaintiff's medical needs, as indicated by the course of conduct related above, plainly make a case for medical indifference. The application should be denied.

CONCLUSION

For the foregoing reasons, plaintiff requests that the court deny the present application to dismiss except as consented to by the defense.

Dated: January 4, 2008

Respectfully submitted,
By /s/Anthony M Giordano, Esq.
Attorney for plaintiff AG (2735)
100 Executive Blvd., Ste 205
Ossining, New York 10562
(914) 923 7746

To: ANDREW M. CUOMO
Attorney General of New York
C/o Maria Barous Hartofilis
Asst. Attorney General
120 Broadway
New York, New York 10271
(212) 416 6295